**Nathaniel HARRIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 13241, 80–1284.**

District of Columbia Court of Appeals.

Argued May 20, 1981.

Decided Jan. 21, 1982.

court, also entered an appearance for appellant.

Darryl W. Jackson, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Theodore A. Shmanda, and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. John R. Fisher, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before KELLY, MACK and PRYOR, Associate Judges.

PRYOR, Associate Judge:

A two-count indictment was filed charging appellant with second-degree murder while armed and second-degree murder, D.C.Code 1973, §§ 22–2403, –3202, in connection with the death of one Furman R. Turner. Following a trial by jury, appellant was found guilty of the greater offense and sentenced to a term of imprisonment of 15 years to life. Appellant's motion for a new trial, alleging ineffective assistance of counsel, was denied. Although the trial court found that counsel's representation had, in fact, been inadequate, it concluded that the essence of appellant's theory of the case—self-defense—had not been blotted out, *Angarano v. United States,* D.C.App., 312 A.2d 295, 298 n.5 (1973), *rehearing denied,* D.C.App., 329 A.2d 453 (1974) (en banc), but was sufficiently presented to the jury by appellant's own testimony. Focusing primarily upon the factors of pretrial investigation, consultation and preparation, we conclude, in the circumstances of this case, that the conviction must be reversed and the case remanded for a new trial.

I

*Trial*

The evidence adduced at trial, revealed the following: Sharon Turner, a resident of Southeast Washington, was appellant's girlfriend and the mother of his child. During the early morning hours of August 1, 1975, appellant went to the home of his girlfriend and knocked on the front door. Both Shar-

Silas J. Wasserstrom, Public Defender Service, with whom Vito T. Potenza, Public Defender Service, Washington, D. C., was on the brief, for appellant. Kenneth E. Labowitz, Alexandria, Va., appointed by the

on's brother, Charles Watkins, and Furman Turner, the decedent, were sleeping in the living room when they were awakened by the banging. Watkins, who heard someone softly calling "come on Sharon," noticed that the front screen door had been propped open. Since the family never left the screen door in that position, Watkins and Turner decided to find out who was outside.

Watkins admitted that he and Turner armed themselves with a stick and a poker or paper picker as they exited the back door to investigate.[1] Upon approaching the front of the house, the two observed appellant standing at the corner of the block. When Watkins called to him, appellant fled in the direction of his home, pursued by Turner and Watkins. Appellant ran to his back yard, through the gate, toward the back door of his house repeatedly calling for his mother. Although Turner continued chasing him into his yard, Watkins remained at the gate, a distance of about 25 feet away from appellant's back door. Watkins testified that he saw appellant turn around and stab Turner with a shiny object that appeared to be a "triangle knife." Watkins acknowledged that when appellant turned around, the decedent was pursuing him with the paper picker or poker in his hand.

Responding to a radio broadcast of a stabbing at 4903 F Street, S.E., two police officers arrived at the location at about 5:25 a. m., and observed Turner lying on the pavement on his back. The officers were informed by an unidentified person that Nathaniel Harris, whose address was given to the officers, had stabbed Turner. As the officers entered appellant's back yard, they noticed that a clothesline in the yard had apparently been broken in a struggle. There were clothes on the ground covered with blood as well as a pool of blood in the grass, with a poker lying near it. When the officers knocked on the door, appellant answered, and in response to officers' questions, identified himself and allowed them to enter the house. The officers asked ap-

pellant if he had any knowledge of a person being injured outside; appellant replied that he stabbed Turner. The officers observed blood on his hands and clothing, and that his knuckles were bruised. While the officers were escorting appellant out of the house, a sergeant informed them that Turner had died. A detective from the Homicide Unit advised appellant of his constitutional rights and asked him if he wanted to make a statement; appellant signed a waiver of rights card and replied in the affirmative. He thereupon began to recount the circumstances surrounding the stabbing. The statement was reduced to writing and signed by appellant.

Dr. Leroy Riddick, a Deputy Medical Examiner for the District of Columbia, performed an autopsy on the decedent which disclosed that Turner had suffered multiple stab wounds. Dr. Riddick concluded that the manner of death was homicide and stated that the poker or paper picker could not have been the instrument used to inflict the decedent's wounds.

Appellant and his mother, Mrs. Hattie Harris, testified on behalf of the defense. Mrs. Harris stated that at approximately 5:20 a. m. on the day in question, awakened by her son's scream, she ran to the back door and observed him engaged in a fight. She went out into the yard, grabbed her son and brought him inside. She did not see any weapons, nor any injuries or blood on Turner as he left her yard. Mrs. Harris also stated that it was not until she returned to the yard to speak to the police officer that she noticed blood.

Appellant admitted going to the home of Sharon Turner in the early morning hours of August 1, 1975, and knocking on the door. He was starting to return to his house when he saw Watkins and Turner coming toward him with weapons. Appellant ran home, calling for his mother to open the back door. Having been struck several times with the weapons of his pursuers, appellant stated that he reached for a garden tool and struck out at Turner.

---

1. Watkin's stick was about a foot and one-half long; Turner's was an "iron paper picker" approximately two feet in length with a six inch handle.

The jury returned a verdict of guilty of second-degree murder while armed.

*Post-Trial Hearing*

At the hearing on appellant's claim of ineffective assistance of counsel, the trial court received the testimony of appellant's mother who stated that shortly after the stabbing, she spoke to her next door neighbor, Ms. Vermelle Wages, who stated that she had witnessed the incident between appellant and the decedent. Mrs. Harris related this information to trial counsel, giving him the name and address of this potential witness. Although he told appellant's mother he would contact this person, he never did. Ms. Wages submitted an affidavit indicating that she had observed appellant standing in his yard, calling his mother, and attempting to get inside. She also observed a person enter appellant's yard and attack him with a stick. "After [appellant] turned around, the two boys started to fight." This witness was never interviewed by trial counsel or any of his representatives.

Mrs. Harris tried to maintain contact with defense counsel by telephone. She called several times leaving messages for him, but her calls were never returned. Similarly, appellant's sister attempted to reach counsel by telephone on innumerable occasions without success. She also sent him a registered letter to which she received no response.

Counsel testified at the outset that he was unable to locate the file used during his representation of appellant. He therefore was unable to recall many of the matters pertinent to the court's inquiry. It is clear, however, that he did not visit the scene of the crime but relied instead on a sketch prepared by other counsel. Similarly, he did not attempt to locate any of the potential witnesses in the neighborhood nor contact the known defense witnesses. He did not interview any government witnesses nor attempt to determine whether any of them had criminal records.

While there was a conference with the prosecutor where discovery and a plea bargain were discussed, counsel did not recall asking for or receiving any documents; nor did he request a copy of the medical examiner's report, or attempt to see photographs of the scene or any of the other physical evidence.

Appellant testified that in preparation for trial he had spoken to defense counsel on only one occasion, which consisted of a 20-minute conversation on the day of the status hearing in the cellblock of the Superior Court building. While this conversation concerned the charges and various participants to the incident, appellant stated that he was never advised of the maximum and minimum penalties he faced, nor informed of any plea offer. Counsel disputed this testimony asserting that he informed appellant of a plea offer to second-degree murder, but conceded that he did not explain the consequences of going to trial as compared to the advisability of entering a guilty plea.[2] There was also dispute as to whether the defense theory was ever discussed in earnest. In this regard, appellant stated that he did not talk with his attorney about testifying until the day of trial. Mrs. Harris, appellant's mother, likewise related that counsel did not discuss her testimony with her prior to calling her as a witness.

At the conclusion of the hearing, the trial court noted the investigative deficiencies which had been demonstrated and referred particularly to

> trial counsel's inattention to plea negotiations and failure to adequately advise and inform defendant of possible sentence and plea alternatives. The inadequacy of trial counsel's preparation in this regard is illustrated by the fact that even at sentencing, counsel believed the defendant (who had been served repeat papers) was eligible for sentencing under the Federal Youth Corrections Act, 18 U.S.C. § 5010(c).... [Mem.Op. at 51–52.]

2. The trial court found that appellant received "minimal or no assistance" with respect to a possible plea and characterized trial counsel's conduct in this area as constituting "excusable neglect."

In reviewing the circumstances presented, the court denied relief on the basis that appellant had received a fair trial.

## II

■ This kind of challenge to a criminal conviction raises difficult questions for an appellate court. The prevailing test that guides us in this area has been stated on a number of occasions; namely, that an accused has a Sixth Amendment right to effective assistance of counsel. To show a violation of this right, one must prove gross incompetence of counsel resulting in the blotting out of a substantial defense. *Angarano v. United States, supra.* In adopting this approach we have recognized that a lawyer, like any other professional, must be accorded sufficient latitude to make decisions or judgments which bring one's professional abilities to bear. Thus, mere errors of judgment as disclosed by hindsight do not constitute ineffectiveness. *Woody v. United States*, D.C.App., 369 A.2d 592, 594 (1977). Further, a defense which is blurred due to incompetence must be shown to be a substantial defense as a matter of law and available from known facts or those obvious to the trial attorney. *Id.*

■ In short, it is not our function, nor should it be, to second guess the countless decisions, particularly those involving trial strategy or tactics, which counsel must make. Notwithstanding these admonitions regarding the proper scope of appellate review in ineffective assistance cases, it is still true that an essential prerequisite to counsel's presentation of an intelligent and knowledgeable defense is the requirement that he consult, investigate and prepare for trial. *Monroe v. United States*, D.C.App., 389 A.2d 811 (1978).[3] Highlighting the importance of pretrial preparation in *Monroe*, this court stated:

> [It] is axiomatic among trial lawyers and judges that cases are not won in the courtroom but by the long hours of laborious investigation and careful preparation and study of legal points which precede the trial. . . . The adversary process

assumes that its proper functioning demands that both sides have prepared and organized their cases in advance of trial. . . . Thus, investigation and preparation are the keys to effective representation in the broad sense in a trial. . . . Neglect of any of these steps may preclude the presentation of an effective defense. . . . It is impossible to overemphasize the importance of appropriate investigation to the effective and fair administration of criminal justice. [*Id.* at 817, quoting ABA Standards Relating to the Defense Function § 4.1, Introductory Note at 224–25, and Commentary at 228 (citation omitted) (Approved Draft 1971).]

Viewing this case within the bounds of our earlier decisions, it is clear without belaboring the undisputed facts, that trial counsel did not investigate this case, nor minimally consult with his client, nor make even rudimentary preparation for trial. The order of the trial judge confirms this. Thus, the narrower question presented is whether, as a result of this incompetence, trial counsel's conduct blotted out the essence of a substantial defense.

■ Viewing the evidence in the light most favorable to the government, and without purporting to weigh the merits, we first conclude that in the context of this case, appellant could claim a substantial or nonfrivolous defense. The government's evidence, as presented by its key witness, revealed that appellant was chased to his residence by two armed persons and ultimately killed the one who pursued him into his own back yard. Prosecuted on a charge of second-degree murder while armed, a substantial defense could derive from lack of proof of the elements of the charge, *Johnson v. United States*, D.C.App., 413 A.2d 499, 504 (1980), or on the affirmative ground of self-defense.

In a case of this nature the defenses are interrelated; a jury must determine if there has been proof of malice necessary for a conviction of murder, or alternatively, proof of homicide in the heat of passion

---

3. We are mindful that the *Monroe* case involved a pretrial determination of the question.

necessary to support a finding of a lesser offense. Lastly, the factfinders must consider whether to completely exonerate the defendant on the basis of self-defense. These determinations, however, can only be made when the jury is informed by counsel of the various defense theories through a coherent presentation of the facts and a cogent application of the law to the facts—both of which stem from adequate pretrial consultation, investigation and preparation.

In attempting to show that his defense was blotted out, appellant has relied upon numerous instances of counsel's ineptitude at trial which were the result of his lack of preparation. Mindful of our admonitions regarding appropriate review, we choose not to explore each allegation. Three instances of conduct, however, had a particularly significant impact on the development of appellant's self-defense theory at trial and thus merit discussion.

First, the prosecutor was allowed to inaccurately argue the respective heights of appellant and the decedent, even though the correct data was available from the medical examiner's report. Specifically, Charles Leon Watkins, the government's key witness, had described the deceased as standing about five feet tall. The prosecutor emphasized this fact in both his redirect questioning of Watkins and in his closing argument where he described the decedent as standing about five feet three. In cross-examining appellant, the prosecutor queried:

Q. You don't agree with Mr. Watkins that [Turner] was about an inch smaller than him, and Mr. Watkins told us yesterday that he was about five four?

A. No. [Turner] was taller than Leon.[4]

Proper preparation would have made trial counsel aware that the autopsy protocol listed the decedent's height at five feet nine inches. This fact bore significantly on the government's excessive force theory.

Secondly, despite the fact that counsel acknowledged at the post-trial hearing the significance of the medical examiner's testimony, he admitted that no pretrial effort to interview him was made. This failure resulted in virtually no cross-examination of this witness at trial. Additionally, the substance of the medical examiner's direct testimony revealed that the decedent was inflicted with an instrument which had a serrated edge; the prosecutor argued that the instrument was a knife. Appellant's counsel did not inquire if the instrument used could have been, as was alleged by appellant, a garden tool; nor did counsel make any effort to establish that the pattern of wounds and the fact that some were of a superficial nature, were consistent with appellant's claim of a heat of passion response to an apparent threat.

Finally, after appellant had testified that he had earlier been convicted of an assault with a dangerous weapon (knife), the prosecutor inquired:

Q. Is it not true that you have used knives before on people?

A. What do you mean by that?

Q. Is it not true that you have used knives on people, attacked people before with knives?

A. No. I have not attacked people with knives.

Q. Your answer is no?

A. To people, yes.

THE COURT: What do you mean by "people?" What do you understand the question "people" to mean?

APPELLANT: I had an incident with one person before this.

THE PROSECUTOR: That was June of the proceeding year, was it not?

APPELLANT: Yes.

THE PROSECUTOR: That person was Mr. Hart [the previous complainant], was it not?

The prosecutor was then permitted to elicit the facts underlying the conviction and by his argument to the jury to suggest that because the appellant had used a knife aggressively before against Hart (who lived at the same address as the appellant's girlfriend), he probably used one in like fashion

---

4. The prosecutor used this inconsistency to attack appellant's credibility and to undermine his claim of fear which, of course, was crucial to his claim of self-defense.

here as well.[5] No limiting instruction was given and in his closing statement the prosecutor argued the facts underlying the conviction to the jury as substantive evidence from which he asked them to infer that the appellant had a knife when he went to Sharon Turner's house and that he possessed the requisite malice to support second-degree murder. Counsel did not object.

The court, in its post-hearing order, recognized that, consistent with our decisions, such evidence of "other crimes" was not generally admissible and was objectionable.[6] Furthermore, the trial court opined that the error, while constituting "negligence" on counsel's part, was not a significant one. We disagree, finding that the error was significant in view of the fact that one of the paramount questions for the jury was whether the decedent was killed in the heat of a struggle. Moreover, where the type of weapon used here was a crucially contested factual issue, the otherwise inadmissible fact of a prior use of a knife was prejudicial to appellant's case.

We conclude, however, that the strength of appellant's ineffective assistance challenge does not depend upon counsel's action or inaction in the courtroom. Rather, the failure to make reasonable efforts to interview and utilize known witnesses having a direct bearing on the substantial defense, the failure to make minimal efforts to discover available information central to the case, as well as the omission of basic communication between client and counsel, culminated, in this instance, in a lack of preparedness which nullified any meaningful plea negotiations and manifested itself in the courtroom so as to blot out a substantial defense.

All that happened here was that appellant and his mother were allowed to testify in court. The manifest inadequacies in trial counsel's preparation thwarted the effective presentation of appellant's self-defense theory to the jury—a presentation appellant was not required to make alone. We are unable to characterize this circumstance as a matter of trial tactics.

Accordingly, we hold that counsel's failure to investigate, consult and prepare, amounted in this case to "gross incompetence which denied a substantial defense."

*Reversed and remanded.*

---

**5.** The prosecutor also misstated the law of self-defense on a crucial issue in this case when he twice informed the jury that if the appellant was the aggressor he could not claim self-defense.

**6.** *Fields v. United States*, D.C.App., 396 A.2d 522 (1978) (prosecutor may not impeach defendant with prior convictions in a manner which suggests to jury that because of his prior criminal acts the defendant is guilty of the crime charged). *See also Ward v. United States*, D.C.App., 386 A.2d 1180, 1182 (1978).