Franklin H. PETTIFORD, Appellant,

v.

UNITED STATES, Appellee.

No. 95–CO–637.

District of Columbia Court of Appeals.

Argued May 9, 1996.
Decided Aug. 28, 1997.

Neal L. Thomas, Washington, DC, appointed by the court, for appellant.

Gina L. Simms, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and L. Jackson Thomas II, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL, Associate Judge, and MACK, Senior Judge.

MACK, Senior Judge:

Appellant Franklin H. Pettiford pled guilty to first-degree murder while armed, second-degree murder while armed and carrying a pistol without a license. After sentencing, appellant filed a motion to vacate his guilty pleas and sentence under D.C.Code § 23–110 (1989), alleging, in part, ineffective assistance of counsel. The Superior Court denied his motion, and appellant appeals.

## I.

### A. Background

The posture of this case reaches this court by a tortuous route of preceding events—two 1989 murders, a seventeen-year-old arrestee's waiver of rights and admissions of being on the scene (but not firing the fatal shot at the time of the second killing), extensive negotiations by defense counsel with the government, a debriefing agreement during which the presence of the arrestee at the scene of the first murder surfaces, the government's declared intention to prosecute the first murder in the federal court where it would seek the death penalty, a superseding plea agreement covering both murders, the entry of pleas of guilty to first and second-degree murders while armed, and subsequent, unsuccessful attempts to withdraw those pleas.

Luther Garvin was shot and killed on November 27, 1989. In March of 1990, appellant was arrested in connection with Garvin's death and was charged with first-degree murder while armed in violation of D.C.Code §§ 22–2401, –3202 (1989). Appellant, after waiving rights, made a statement to the police; he admitted to being present at the murder of Garvin and to firing his gun into the air over the head of the decedent; he also admitted receiving a car in payment for his participation in the slaying. However, he maintained that his codefendant, Michael McIntyre, actually killed Garvin.

Thereafter, appellant's court-appointed attorney, Michael Dowd, began plea negotiations with the government, and as a result, appellant entered into a preliminary "debriefing" agreement (and a subsequent plea agreement). Under the agreement, he was to provide (and to continue to provide) the prosecutors and other law enforcement agencies with information regarding individuals involved in criminal activity. On September 14, 1990, after waiver of indictment and pursuant to the plea agreement, appellant pled guilty before the Honorable Ricardo Urbina (hereinafter the "plea judge") to an information charging him with second-degree murder while armed, in violation of D.C.Code §§ 22–2403, –3202 (1989), and to carrying a pistol without a license, in violation of D.C.Code § 22–3204(a) (1989), in connection with the murder of Garvin. The plea judge accepted the plea.

During one of the debriefing sessions in January of 1991, the June 30, 1989, shooting death of Angela Jones, a government witness, was explored. Appellant admitted his presence at the murder scene, but claimed that he had not fired his gun. He stated that another individual, Jerry Rose, had actually committed the murder. (The government claimed that prior to appellant's statement at the debriefing session it had talked to an informant who implicated appellant in the Angela Jones murder. Following the debriefing, the government alleged that it had located an eyewitness who also implicated appellant.) The government threatened to prosecute appellant for the murder of Angela Jones in federal court under a federal statute which allowed the death penalty for the murder of a government witness. Appellant's counsel again engaged in plea negotiations, and appellant entered into a superseding plea agreement that covered both the Jones and the Garvin murders. Under this agreement, appellant was to plead guilty to first-degree murder while armed in connection with the Angela Jones murder, and his pleas with respect to the Luther Garvin killing would remain the same as before (i.e., second-degree murder while armed and carrying a pistol without a license). On June 10, 1991, appellant pled guilty to the Angela Jones murder before the plea judge, who accepted the plea.

### B. Sentencing Hearing

Appellant's sentencing hearing was held on September 9, 1991. After defense counsel and the government had completed allocution, but before the sentence was imposed, the plea judge addressed appellant:

Mr. Pettiford, this is your opportunity to say what you think it is important for me to know in addition to what you have already said in your letter. As I think about what the sentence should be in your case, what is it that you would like to say, sir?

Appellant responded:

Your Honor, I'd like to say three things, and I hope you know that you can grant

me three wishes: one, I want to take my cop back and go to trial; two, I want a new lawyer because of the fact that he did not help me through my case, and he was telling me all sorts of lies about that if I go to trial, ain't no such thing as appeal, and my case is—I should have been told you this—but I sit here and listen to him, let him, you know, try to guide me, but—and two, I really—I want to go to trial. That's the first three wishes I would like to have. I would—

The discussion continued as follows:

Q: Well, in addition to that, is there anything you wish to [say] about what the sentence should be? Should I deny your motion to vacate your guilty plea at this time?

A: I would just like—

Q: In other words, you are asking me to vacate your plea—

A: Yes, sir.

Q: —and let you go to trial?

A: Yes.

* * * * * *

Q: Is there anything you want me to know about sentencing you in addition to what you have already said?

A: I'm sorry for, you know, what really happened to the people, but I guess I just got caught up in the fast lane, growing up with the older boys, you know. I, I ain't never had no brothers around. All I had was my sisters and my mother. That's all I had, and I just wanted to be, you know, if I— maybe if I'd listened to my mother, maybe I wouldn't have been in this type of trouble here today, you know, but I just wanted to be a knucklehead and hang out with the older fellows.

The plea judge then indicated that he would deny appellant's motion to vacate his guilty pleas, concluding:

Well, Mr. Pettiford, I am going to deny your Motion to Vacate Your Plea at this time without prejudice. What that means

is what I hear you saying is that you don't want Mr. Dowd to represent you on this issue, and in that regard, you will be entitled to have new counsel review your situation and ask the Court properly and formally to reconsider your sentencing in the case and reconsider your plea in the case.

The court proceeded to sentence appellant to twenty years to life imprisonment on the charge of first-degree murder in connection with the Angela Jones murder, seven to twenty-one years imprisonment on the charge of second-degree murder in connection with the Garvin murder, to be served consecutively, and one year imprisonment for the charge of carrying a pistol without a license, to be served concurrently with the second-degree murder charge.

### C. § 23–110 Motion

Some time after this sentencing hearing, appellant's counsel, Michael Dowd, moved to withdraw from the case. The court appointed a series of new attorneys for appellant, and on March 28, 1994, appellant filed a "Motion to Vacate Guilty Pleas and Sentence Pursuant to 23 D.C.Code, Section 110." In his motion, appellant alleged "that the Court failed to conduct an inquiry of his claim of ineffective assistance of counsel and his request for a new counsel made during the sentencing hearing; that he was denied the effective assistance of counsel prior to his guilty pleas and at time of sentencing; that the substance and nature of the charges were not explained to him; and that the agreements entered [into by] the government ... were breached by the government." [1]

The Honorable Steffen W. Graae (hereinafter the "motions judge") held an evidentiary hearing on this motion in April of 1991. Judge Graae heard the testimony of appellant and three witnesses, FBI Special Agent Dan Reilly, Counsel Michael Dowd, and Assistant United States Attorney L. Jackson Thomas II.

### 1. Special Agent Reilly's Testimony

Special Agent Reilly testified, that in the process of investigating an ongoing criminal

---

1. Appellant does not argue *on appeal* that the substance and nature of the charges were not explained to him, or that the government breach- ed the agreements. Therefore, we will not discuss these issues further.

conspiracy, he was present at the debriefing sessions with appellant. Appellant first discussed the Angela Jones murder on January 7, 1991; on one report of the proceedings on that day, the agent had recorded that appellant's counsel, Michael Dowd, was present for the meeting, but on the other, due to an oversight, he had not recorded such presence. The agent did not recall Mr. Dowd stopping the proceedings when appellant began discussing the Angela Jones murder; he did not have information connecting appellant to the Angela Jones murder prior to this meeting. However, further investigation revealed that two witnesses could connect appellant to the shooting. On cross-examination by the government, the agent stated that to his recollection Mr. Dowd was present at every meeting, and on the occasions when appellant arrived before Mr. Dowd, substantive matters regarding appellant's case were not discussed until Mr. Dowd arrived.

### 2. Michael Dowd's Testimony

Counsel Michael Dowd testified that, prior to plea negotiations regarding the Luther Garvin murder, he had prepared for appellant's case by talking to appellant and the detective who took appellant's confession. Appellant admitted knowing that the men intended to shoot Garvin, and that he himself shot at Garvin four times, though stating that he had aimed just over his head. Counsel did not interview any other witnesses or hire an investigator. Because appellant told him that he knew of his rights when he made the statement to the police, he concluded that they probably would not be able to get the confession suppressed.

Counsel was approached by the government soon after appellant's preliminary hearing to discuss the possibility of appellant identifying other individuals with whom appellant was involved in criminal activity. Appellant was anxious to cooperate, and thereafter, appellant and the government entered into the "debriefing" agreement. According to this agreement, the government could not make direct use of any statements made by appellant, but there was a reservation for derivative use of such statements. Counsel explained this to appellant in layman's terms prior to appellant's signing of the agreement,

and appellant fully understood the agreement, as well as the fact that cooperating with the government would help in terms of his sentencing if he decided to plead guilty. Immediately following the execution of the debriefing agreement, counsel and appellant attended meetings with the government in which the Garvin murder was discussed.

Counsel further testified that in September of 1990, the government made a written plea offer to appellant, and that he went over the plea offer with appellant in detail, explaining the differences between first and second-degree murder in terms of the requisite intent and the sentencing differences. He reviewed the strength of the government's case, noting that it would be very hard to overcome appellant's confession. He identified the rights appellant would give up if he pled guilty; he denied that he told appellant that he would not have a right to appeal if he went to trial.

The debriefing agreement was formally executed by appellant and the government on September 10, 1990. The agreement said the following about the government's use of information provided by appellant:

> The Government will not use any information which Mr. Pettiford provides pursuant to this agreement against him directly as an admission or otherwise in a Federal, state, or local criminal prosecution unless Mr. Pettiford breaches the agreement.
>
> *     *     *     *     *     *
>
> Nothing in this agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, to commit any other crime, or to protect your client from prosecution for any violent crime which he has committed or might commit or any other crimes committed after the execution of this agreement.

Mr. Dowd explained that he understood the plea agreement and the debriefing agreement to mean the same thing regarding the government's use of information provided by appellant: while it could not use appellant's statements directly against him, the government could use information derived from appellant's statements. He believed that po-

tential derivative use of the information was implicit in the plea agreement.

Mr. Dowd also stated that on occasion appellant would express a desire to take back his guilty plea, but after discussing it with Mr. Dowd, he would change his mind.

Counsel testified that he advised appellant to answer the government's questions at the debriefing sessions but not to volunteer any information. He stated that he was present for all of the debriefing sessions, including the meeting on January 7, 1991, when the subject of the Angela Jones murder was first discussed. He further stated that he had no knowledge about appellant's involvement in this murder prior to the meeting, and that the Assistant United States Attorney brought up the subject. At this point, he asked to speak with appellant alone, and appellant told him that he had gone to see Angela Jones with one Jerry Rose, who had actually committed the murder. Appellant said that he was there to cover Mr. Rose's back, but did not mention that he had a weapon at first. Thereupon counsel advised appellant that he could refuse to answer the questions, which would probably be considered a breach of the plea agreement, and might lead to a first-degree murder prosecution for the Luther Garvin killing. He also advised appellant that if he was telling the truth and had not been involved in the actual killing, then he should answer the questions. After their conversation appellant decided to answer the government's questions, and eventually it came out that appellant had carried a gun with him and that he had known why they were going to see Ms. Jones.

Mr. Dowd further testified, that soon after this discussion, the government began to speak of charging appellant with the Angela Jones murder. Two months later, government agents told appellant that an independent eyewitness had seen appellant take part in the killing, and that they were going to indict appellant in federal court, and request the death penalty, because Angela Jones was a government witness. Counsel explained that he did not investigate this eyewitness or undertake any other type of investigation because appellant had admitted being at the scene with a gun and knowing that they were there to kill Angela Jones. He believed that further investigation would be unnecessary, and said that appellant did not provide him with any possible defense witnesses or suggest any defenses. Therefore, he began engaging in plea negotiations for this second murder after discussing it with appellant. However, Mr. Dowd testified that around the time of the second plea agreement appellant told him that he no longer wanted to plead guilty to the Angela Jones murder. He stated that he told appellant the potential consequences of such a decision, and appellant changed his mind, although he continued to vacillate about the decision. Counsel emphasized, however, that the final decision to take the plea was made by appellant.

Mr. Dowd also emphasized that he continuously tried to get a better deal for appellant, and that he genuinely feared that the government planned to try to get the death penalty for appellant. On May 8, 1991, appellant and the government entered into a superseding plea agreement under which appellant was to plead guilty to the first-degree murder while armed of Angela Jones, as well as abide by the requirements of the original plea agreement.

Mr. Dowd testified that prior to sentencing appellant told him that he did not believe he was getting a good deal. For the sentencing hearing, counsel prepared a sentencing memorandum highlighting appellant's cooperation with the government and attempting to minimize appellant's involvement in the killings. He met with appellant before the hearing and he went over the sentencing memorandum, and told appellant what he thought appellant should say to the judge. Appellant did not express any dissatisfaction with his legal services before sentencing, nor did he tell counsel that he wanted to withdraw his guilty pleas. Immediately after appellant addressed the court, asking for his pleas to be vacated, counsel, appellant, and appellant's mother had a discussion off the record. During this discussion counsel told appellant that if he really wanted him to, he would withdraw from the case and ask the judge to appoint new counsel. Appellant said he wanted to go ahead. (It should be noted that

this conversation does not appear in the transcript, nor does there appear to have been a pause in the proceedings.) Mr. Dowd explained that he did not stop the proceedings, and request an ineffective assistance of counsel hearing, because he did not believe that appellant was really displeased with his representation. He stated that if he had believed that appellant was sincere, he would have filed a motion to withdraw.

Finally, Mr. Dowd testified that two months after the sentencing hearing, he received letters from the plea judge that appellant had forwarded to the judge's chambers. These letters indicated that appellant wanted to withdraw his guilty pleas and to vacate his sentences. Appellant also wrote that he was dissatisfied with Mr. Dowd's representation. In response, counsel moved to withdraw from the case and asked that new counsel be appointed. He stated that appellant never said that he was innocent of killing Luther Garvin or Angela Jones.

### 3. Appellant's Testimony

Appellant testified that Mr. Dowd came to see him before the preliminary hearing to discuss the Luther Garvin murder. He told Mr. Dowd that he, Michael McIntyre and Jerry Rose were present at the Luther Garvin murder, and that McIntyre had shot and killed Garvin, while he had shot over Garvin's head. He had tried to explain to Mr. Dowd that certain things in his statement to the police had been incorrect, but counsel had not listened to him. He had not looked at the statement prior to signing it; the police had told him to sign it. Appellant also testified that Mr. Dowd did not explain to him what the government's evidence was against him, except for the confession, nor did counsel explain to him his chances of being acquitted if he went to trial. Mr. Dowd told him that he would not be able to appeal if he went to trial.

Appellant further testified that he had a seventh grade education and that he could not read very well. Mr. Dowd never read the documents involved in the plea negotiations to him, but the Assistant United States Attorney had read these documents to him. Mr. Dowd merely told appellant to sign the documents. He admitted that Mr. Dowd had read at least the debriefing agreement to him before he signed it, but claimed that counsel had not explained it to him. He believed that under the documents the government could not use any information he gave them against him. He never agreed to testify against his codefendants.

Appellant testified that he told his counsel about his presence at the scene of the Angela Jones murder about two months before the discussion about the murder in the debriefing session. He told Mr. Dowd that Jerry Rose knocked on Angela Jones' door, and shot her when the door was opened. He told Mr. Dowd that he did not know what was going on and left the scene. Appellant also denied that he ever told Mr. Dowd or the government that he had gone to Angela Jones' house on a prior occasion; he denied that he admitted that he had known that Rose was going to the house to kill Ms. Jones. He testified that when the subject of the murder came up in the debriefing session, Mr. Dowd did not stop the conversation to talk to him privately, and merely told appellant that if he knew anything he should tell the government. The Assistant United States Attorney told him that the government had a witness who represented that appellant was involved in the Angela Jones murder. He discussed the Angela Jones murder with the government because government counsel told him about this witness. He decided to plead guilty to the first-degree murder of Angela Jones because his own counsel told him that he would get a forty or fifty year sentence if he went to trial. Counsel did not explain that a first-degree murder conviction carried a mandatory twenty years to life sentence; he did not believe that the government would seek the death penalty. Appellant admitted that the judge at the plea hearing explained to him that he would get twenty years to life on the first-degree murder charge, and that he understood this.

Finally, appellant testified that Mr. Dowd did not ask him about any potential witnesses in these cases, and that he did not investigate an individual that appellant mentioned in re-

lation to the Luther Garvin murder. He admitted that this witness would not have been able to say that he did not shoot at Mr. Garvin because she was not present at the scene of the murder. He stated that about a month and a half before sentencing he told Mr. Dowd that he wanted to take his pleas back. He wanted to vacate his pleas because he did not feel that Mr. Dowd had adequately represented him, and because Mr. Dowd was telling him that if he went to trial he would "never see the streets again," and that "there was no such thing as parole." He learned from others he talked to that he could appeal a conviction, and therefore he decided to withdraw his pleas. While he had been unhappy with Mr. Dowd's services prior to sentencing, he never told the court at the plea hearings because Mr. Dowd had told him to go along with what the court said.

### 4. Assistant United States Attorney L. Jackson Thomas' Testimony

Mr. Thomas, testifying on behalf of the government, stated that he was responsible for the investigation of the Luther Garvin case, and that he and Mr. Dowd had discussed appellant's potential cooperation. Counsel stated that to his recollection the debriefing agreement stated that the government could not make direct use of appellant's statements, but that it could make derivative use of them. He had explained the agreement to appellant before the government began debriefing him. Mr. Dowd was present at all of the debriefings, and while he may not have been there for the entire meeting on every occasion, Mr. Dowd was always there when they discussed legal matters. The government had extended a plea offer to appellant, in which appellant was to agree to provide information and to testify for the government if asked. Mr. Thomas explained the agreement to appellant in detail before appellant signed it. He conceded that while the plea agreement provided that the government could not use appellant's statements directly against him unless he breached the

agreement, it did not explicitly state that the government retained the right to make derivative use of the statements. He, however, had explained to appellant that the government could make derivative use of his statements under the agreement.

Mr. Thomas further testified that prior to the first meeting in which the Angela Jones murder was discussed, the government had a witness who had implicated appellant in the murder.[2] At that time, appellant admitted that he and Jerry Rose had gone to Angela Jones' house the day before the murder, and had returned the next day to accomplish their objective of killing her. However, appellant stated that he did not actually shoot her. Government counsel could not remember whether Mr. Dowd stopped the meeting to talk privately with appellant before he gave information regarding the Angela Jones murder. A few months after this first discussion, the government was approached by a second informant, who as an eyewitness, also implicated appellant in the murder. This eyewitness said that appellant had gone to the door of Angela Jones with a gun in his hand, and had actually fired during the course of the incident.

Mr. Thomas further testified that at some point during their discussions regarding the Angela Jones murder, he told appellant that he intended to file charges against him for her murder, and that he planned to recommend that the government seek the death penalty. He admitted that at that point he did not have authority from his superiors to prosecute appellant and seek the death penalty. He informed Mr. Dowd of the existence of an eyewitness to the murder. Thereafter appellant agreed to plead guilty to first-degree murder while armed and to testify against the other participants in the murder. To government counsel's recollection, appellant and Mr. Dowd had a discussion during a pause in the proceedings after appellant expressed his concerns to the court and asked for a new lawyer.

**2.** At first, Mr. Thomas stated that the government had two witnesses who had implicated appellant in the Angela Jones murder prior to the meeting

in which it was first discussed. The next day he corrected his prior testimony and explained that

### D. Trial Court's Ruling[3]

The trial court denied appellant's § 23–110 motion. In response to appellant's argument that the sentencing court should have held a *Monroe–Farrell*[4] hearing prior to sentencing on the ineffective assistance of counsel claims raised by appellant, the trial court stated:

> [I]t seems to me we have addressed the bottom line question, which is the one that you're aiming at anyway, of whether the plea should be vacated, and thus the sentence should be set aside.... So, I would suggest to you it's kind of immaterial what happened back before Judge Urbina on the day of sentencing, because we are revisiting the whole question from ... the beginning point.

The court proceeded to evaluate Mr. Dowd's assistance to appellant under the *Strickland*[5] test. For example, in response to appellant's argument that Mr. Dowd did not sufficiently investigate this case, the trial judge stated:

> [I]ndeed, an investigation is an integral part of the process of even working out a plea agreement. I wouldn't argue with you on that. And, I'm certainly not condoning Mr. Dowd's statement where he appears to articulate a—that his general practice is not to conduct an investigation where it's gonna end up in a plea. I agree. I do not think that is appropriate standard for a defense lawyer to apply to his responsibilities.
>
> However, even if you were to get past that first prong of the *Strickland* test, namely that it's generally accepted professional practice to proceed in this way, you still have to establish to the Court's satisfaction that there—that there is a prejudice, that you've met the second prong of the test. And, I think that's where there really isn't anything I can think of that will

support a claim of ineffective assistance of counsel.

> I think the record—there's nothing to suggest here that there is some other evidence that would exonerate your client. In fact, I've heard of not a shred of evidence for the proposition, that he was not involved in the Luther Garvin murder, and he was not involved in the Angela Jones murder. And, there—no witnesses have been mentioned to the Court. No evidence has been lately uncovered that would in any way exonerate Mr. Pettiford from his involvement in those two crimes.
>
> So, even if—as you aptly argue Mr. Dowd failed to make a—conduct an investigation, independent investigation of these two offense[s], you haven't presented me with anything that would suggest that there was something for him to uncover that he failed to uncover, and thus—I don't see any evidence in the case for the proposition that your client has met the second prong in the *Strickland* test.

Following the arguments of appellant and the government, the trial court stated in part:

> [W]ith respect to the—to the argument that Mr. Dowd was not providing effective representation during the plea process, I am as I indicated, I am unconvinced. I don't think that you've met, in fact, either prong of the *Strickland* test with respect to Mr. Dowd's performance.
>
> I think it was well within professional bounds, the manner in which he represented Mr. Pettiford during the—during the plea negotiations and up through sentencing. And, I want to make clear here at this point something that we haven't directly addressed, but I do hear Mr. Pettiford testify yesterday in what I considered to be a very vague, general and unconvinc-

---

the government had only known of one of the witnesses at the time of the first discussion.

**3.** The trial judge allowed appellant and the government to make final arguments after they were finished presenting witnesses. The judge made comments responding to these arguments as well as making a final statement. Since some of the judge's comments during the arguments help to explain his final ruling, they are also presented here.

**4.** *Monroe v. United States*, 389 A.2d 811 (D.C.), cert. denied, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Farrell v. United States*, 391 A.2d 755 (D.C.1978).

**5.** *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

ing fashion about his relationship with Mr. Dowd. And, in all candor, I do not believe that Mr. Pettiford gave us an accurate account of the performance of Mr. Dowd and what Mr. Dowd explained to him and did not explain to him, in the course of their attorney/client relationship.

I am satisfied, I believe based on everything that I've [heard] in this case, Mr. Pettiford was fully, adequately and completely advised, not only by Mr. Dowd, but by—on many of the crucial aspects, by Mr. Thomas himself. And, so there cannot be really any question but that, in my mind, but that Mr. Pettiford knew exactly what he was doing and was fully and adequately and well-informed by those who were responsible for communicating with him. So, I don't, as I said the bottom line is, I do not really credit his testimony about this relationship.

The trial judge further stated that he did not believe that it was ineffective assistance of counsel for Mr. Dowd to negotiate the plea agreement. The judge concluded that the plea agreement was clear in its meaning, and that appellant understood the conditions of the agreement. Finally, the judge reiterated that there was no evidence to satisfy the second prong of *Strickland*:

> [n]othing has been presented to the Court in this case that would persuade me that there was somehow some evidence out there that Mr. Dowd failed to uncover, that somehow the outcome would have been different. I think the Court can have confidence in the outcome in this particular case.

Therefore, the judge denied appellant's § 23–110 motion.[6] Appellant filed a timely appeal.

## II.

In view of arguments before us, it is important that we identify the precise issues as we see them. Did the plea judge err in initially denying the defendant's motion to withdraw pleas of guilty, based on ineffective assistance of counsel, without holding a hearing? Did the trial judge, in reconsidering that motion after sentencing, apply the appropriate standard of review?

■ As described above, appellant first made his concerns about his guilty pleas known to the court at the sentencing hearing. The plea judge considered appellant's statement to be a motion to vacate his guilty plea. Since it was made prior to the court's imposition of the sentence, it should have been treated as a presentence motion to vacate a guilty plea under Super. Ct.Crim. R. 32(e). At this point, the plea judge should have stopped the proceeding and scheduled a hearing, after determining whether new counsel had to be appointed. *See Taylor v. United States*, 366 A.2d 444, 447 (D.C.1976) (defendant is entitled to a hearing before a presentence motion to withdraw guilty plea can be denied). Instead, the plea judge expressed his concern that appellant would not want Mr. Dowd to represent him on this issue, denied the motion without prejudice, and told appellant that he would be "entitled to have new counsel review your situation and ask the Court properly and formally to review your sentencing in the case and reconsider your plea in the case." The plea judge then proceeded to sentence appellant.

■ Appellant, through newly appointed counsel, later filed a § 23–110 motion to vacate his pleas and sentence. The motions judge then proceeded to treat the motion as a typical post-sentence § 23–110 motion. We find that it should have been treated as a presentence motion to withdraw appellant's guilty pleas because of the procedure followed by the plea judge. Therefore, the motions judge applied an inappropriate standard in evaluating appellant's claims. The judge evaluated appellant's claims of ineffective assistance of counsel under the standard set forth in *Strickland*, requiring prejudice to the defendant in order to establish a claim. In the context of guilty pleas, we have only applied the *Strickland* standard when appellant raises an ineffective assistance of counsel claim in a post-sentence motion to vacate his plea. *See, e.g., Wilson v. United States*, 592

---

**6.** In denying this motion, the judge also concluded that the sentencing judge satisfied the requirements of Super. Ct.Crim. R. 11 in accepting appellant's pleas. This ruling has not been appealed.

A.2d 1009, 1013 n. 8 (D.C.), *cert. denied,* 502 U.S. 1017, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991); *Morrison v. United States,* 579 A.2d 686, 689 n. 6 (D.C.1990). When evaluating a presentence motion to vacate a guilty plea, we consider the competency of appellant's counsel as one of the factors, but we have never required a showing of prejudice as found in *Strickland. See Gooding v. United States,* 529 A.2d 301, 306–07 (D.C.1987). Therefore, the motions judge erred in applying the *Strickland* standard to appellant's motion to vacate his pleas, and in not evaluating the other factors presented in *Gooding.* We will undertake the appropriate analysis below.

### III.

There are two ways in which an accused may successfully move to withdraw a guilty plea under Super. Ct.Crim. R. 32(e), one of which is to establish a "fatal defect in the Rule 11 proceeding at which the guilty plea was entered." *Gooding, supra,* 529 A.2d at 305 (footnote omitted). The motions judge considered appellant's argument that there was such a Rule 11 defect, and rejected it. Appellant has not argued that this ruling was in error on appeal, and therefore we need not consider it further.

█ An accused may also seek to withdraw a guilty plea under Rule 32(e) by showing that "justice demands withdrawal in the circumstances of the individual case." *Id.* at 305–06. When a motion to withdraw is made prior to sentencing, as it was here, the motion should be granted " 'if for any reason the granting of the privilege seems fair and just.' " *Id.* at 306 (quoting *Kercheval v. United States,* 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927)) (other citations omitted). The factors we use to determine whether it would be "fair and just" to allow the withdrawal of a guilty plea are as follows: (1) "whether the defendant has asserted his or her legal innocence;" (2) "the length of delay between entry of the guilty plea and the desire to withdraw it;" and (3) "whether the accused has had the full benefit

of competent counsel at all relevant times." *Id.* at 306–07 (citations omitted). We noted in *Gooding* that "[n]one of these factors is controlling and the trial court must consider them cumulatively in the context of the individual case." *Id.* at 306. We also stated that "[o]n fair and just motions, 'leave to withdraw a guilty plea prior to sentencing should be freely allowed.' " *Id.* (quoting *Poole v. United States,* 102 U.S.App. D.C. 71, 75, 250 F.2d 396, 400 (1957) (citations omitted)).

### A. Competency of Counsel

We will consider the competency of counsel factor first. This court has recognized the importance of pretrial preparation by defense counsel:

> [A]n essential prerequisite to counsel's presentation of an intelligent and knowledgeable defense is the requirement that he consult, investigate and prepare for trial.

*Harris v. United States,* 441 A.2d 268, 272 (D.C.1982) (citation omitted). We have also recognized that defense counsel must make preparations in order to engage in plea bargaining:

> [T]he Supreme Court has stated that trial counsel's failure to become informed of the facts bearing on a plea situation might satisfy the standard necessary to vacate a plea on collateral attack.

*Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990) (citing *Tollett v. Henderson,* 411 U.S. 258, 266–67, 93 S.Ct. 1602, 1607–08, 36 L.Ed.2d 235 (1973)).[7] Standards promulgated by the American Bar Association also discuss the importance of investigating a case, even if the defendant intends to plead guilty:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authori-

---

7. Note that in our case we are dealing with a presentence motion to withdraw a guilty plea as opposed to a collateral attack on a guilty plea,

and therefore we follow a lower standard than that applied in *Ramsey.*

ties. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards for Criminal Justice, *The Defense Function* 4–4.1(a) (3d ed.1993).

We must evaluate whether Mr. Dowd provided appellant with competent assistance based on the record before us. We note that the motions judge did not believe appellant's account of his relationship with Mr. Dowd. Recognizing that the trial judge had the opportunity to view the witnesses, we do not attempt to dispute this finding. However, even based on the testimony of Mr. Dowd, we have grave concerns about his preparation in this case. Mr. Dowd admitted that he did not investigate the Luther Garvin killing beyond finding out about appellant's confession, and that he did not investigate the Angela Jones murder. He testified that he did not feel that such investigation was necessary because in both cases appellant admitted his involvement in the crimes. The motions judge also expressed concern regarding Mr. Dowd's lack of preparation:

> I'm certainly not condoning Mr. Dowd's statement where he appears to articulate a—that his general practice is not to conduct an investigation where it's gonna end up in a plea. . . . I do not think that is an appropriate standard for a defense lawyer to apply to his responsibilities.

The lack of preparation in this case is especially troubling in view of the fact that Mr. Dowd steered his own client, contemplating a guilty plea and already charged with one murder, through the "debriefing process"[8] which ultimately led to the charge of an even more serious murder invoking the threat of increased punishment. We find that Mr. Dowd's lack of preparation in this case weighs heavily in favor of granting appellant's motion to withdraw one of his guilty pleas.

8. *See Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc).

9. Q: All right. Mr. Pettiford, you do admit to telling your attorney that you went to [Angela Jones'] house the day she was killed, and you knew that Rose and [McIntyre] were going there to kill her?

### B. Length of Delay

We consider next "the length of delay between the entry of the guilty plea and the desire to withdraw it." *Gooding, supra,* 529 A.2d at 307. Appellant entered his first plea on September 14, 1990, and his second plea on July 10, 1991. He first expressed his desire to withdraw these pleas to the court on September 9, 1991, some two months after the superseding plea agreement that covered both murders. This could hardly have been prejudicial to the government. It is true that appellant made the withdrawal request at the last possible moment before sentencing. However, based on the testimony at the § 23–110 hearing, it is clear that appellant expressed reservations about pleading guilty well before the sentencing hearing. Mr. Dowd's testimony confirms that appellant had vacillated about his decision to plead guilty. Moreover, appellant claimed that he did not convey these concerns to the court earlier because he was following the advice of Mr. Dowd and certainly counsel's testimony as to the ill-advised strategy employed in defense would also confirm this fact. We do not find that delay between entry of plea and motion to withdraw presents a persuasive reason to deny the motion to withdraw.

### C. Assertion of Innocence

Finally, we will consider whether appellant has asserted his legal innocence. *Id.* at 306. At no point during the sentencing hearing did appellant voice his innocence. Rather his plea for leniency bordered on the nature of an apology. By his own testimony at the hearing on his motion to vacate, he was involved in the killing of Garvin. When asked about the Jones murder, appellant responded in a colloquy that could be evidence of the lack of premeditation necessary for first-degree murder or perhaps a claim of innocent presence.[9]

A: I did not tell him that I knew she was going to be killed. Let me explain something, one thing, okay? When we went to that lady's house, okay, it was me, Jerry, okay? Went up on the porch. Jerry had asked me to knock on that lady's door. I didn't know whose house that was because

As to the Garvin murder, appellant has made a "bald assertion of innocence" that some judges have found unpersuasive in other cases, *see Springs v. United States,* 614 A.2d 1, 5 (D.C.1992) (quotation omitted) (citing, *inter alia, Gooding v. United States,* 513 A.2d 1320, 1344 (D.C.1986) (Ferren, J., dissenting) (*Gooding I*), *vacated, reissued as amended,* 529 A.2d 301 (D.C.1987)). Since a court, however, has discretion to permit presentence withdrawal of guilty pleas on grounds not including assertions of legal innocence, an assertion of innocence is not a prerequisite to withdrawal of a voluntary plea. It is not an independent ground justifying withdrawal of a guilty plea but one of many factors to be considered under the presentence fair and just standard. *Gooding, supra,* 529 A.2d at 306 n. 8 (citing, *inter alia, Nagelberg v. United States,* 377 U.S. 266–67, 84 S.Ct. 1252–53, 12 L.Ed.2d 290 (1964)).

Therefore looking to the *Gooding* factors "cumulatively in the context of [this] individual case," we examine the assertions and admissions made by appellant at his belated hearing. He admitted his presence at the scene of both murders. He admitted that he fired over the head of Garvin (and he is serving a sentence imposed for second-degree murder for his involvement in that case). He denied knowing that his companion was going to the home of Ms. Jones to commit murder; he denied that he shot Ms. Jones, and the Assistant United States Attorney confirmed this latter fact (*see also* note 7 *supra*). The Assistant United States Attorney also confirmed that, on the basis of the location of an eyewitness located after the debriefing process, he told appellant that the government would request the death penalty and that thereafter appellant agreed to the plea of first-degree murder.

■ When we balance this scenario together with the other *Gooding* factors, including the question of the competency of counsel judged by the proper legal standard,

we find that the trial court abused its discretion in refusing to permit the withdrawal of the plea to first-degree murder. We, therefore, reverse the conviction on that count. In all other respects, the judgment is affirmed.

*So ordered.*

FARRELL, Associate Judge, concurring:

I agree that the standard for presentence withdrawal of a guilty plea governs this case, and that under that standard the trial judge should have allowed Pettiford to withdraw his plea to the Jones murder, but not the Garvin murder.

Critical to our decision on both charges, as I see it, is the representation afforded by Pettiford's trial counsel. That is because the other factors relevant to whether Pettiford met the "fair and just" standard for plea withdrawal—*i.e.,* the timeliness of his motion and assertion of a claim of legal innocence—would not by themselves convince me that the judge abused his discretion in denying withdrawal as to either murder charge. And, as to the Garvin murder, there is no sound basis for saying that counsel failed to perform competently in connection with the plea. Pettiford confessed to the police to complicity in the murder, admitting that he had approached Garvin armed, with two others whom he heard say "you know what we have to do," and that he fired four shots at Garvin, though assertedly over his head. He also told the police that the killing was drug-related and that he was given a car as payment for his role in it. His counsel identified no arguable basis for winning suppression of the confession. The plea to second-degree murder while armed spared Pettiford exposure to a first-degree murder charge for what was, in essence, a pre-arranged assassination.

The plea of guilty to *first-*degree murder while armed for the Jones murder is a different matter. On the basis largely of a repre-

---

I don't go around knocking on anybody's door unless I know them. When that—when that occurred, the lady—the dude that answered the door—when the dude answered the door, ... Ms. Jones had come down the steps, and I heard her say

you stupid MF. By that time, I seen Jerry had his gun out, got to firing. Once Jerry had to fire, I turned around and broke down the steps. Jerry was still on the steps.

sentation by the prosecutor that he would ask permission from his superiors to seek a capital murder indictment in federal court (under newly enacted legislation), counsel advised Pettiford to accept a plea offer to first-degree murder while armed in Superior Court, bringing with it a mandatory minimum term of twenty years in prison. Although the prosecutor had told counsel he had an eyewitness who would tie Pettiford to the shooting, counsel made no further inquiry or investigation concerning the witness—for the reason alone that Pettiford had told his mother and *counsel* "that he was part of the killing in the sense that he went there with the shooter," himself armed and knowing "why they were going there." In counsel's view as explained at the hearing, asking the prosecutor for the eyewitness's name, asking to speak with that witness, or having an investigator try to locate the witness to question him were the sort of "things I would have done had the case gone to trial. I would have prepared for trial differently than preparing for a plea." When one adds to this counsel's apparent obliviousness to the uncertainty of the prosecutor's chances of obtaining a capital murder indictment and conviction,[1] the deficiency in counsel's performance is stark, and the reality that the first-degree murder plea may have been no "bargain" at all makes this a compelling case for presentence withdrawal.

On the other hand, had Pettiford accepted an offer to a plea of *second*-degree murder rather than face a possible capital murder indictment, it would be harder to question the adequacy of counsel's performance. Even if he accepted more or less at face value the prosecutor's claim to have an eye-witness naming Pettiford as an accomplice, a plea to murder-II might have been a genuine trade-off given the prosecutor's intent to seek the death penalty for this murder of a government witness. An intriguing question, therefore, is whether this court could properly vacate Pettiford's first-degree murder conviction for the Jones slaying, but leave intact an implicit conviction for the lesser-included offense of murder-II. The government has not argued this as a remedy, however, and I

have found no decisions where appellate courts in the plea context have utilized their authority (while vacating a greater conviction) to direct entry of judgment on a lesser included offense. *See, e.g., Rutledge v. United States,* —— U.S. ——, ——, 116 S.Ct. 1241, 1250, 134 L.Ed.2d 419 (1996). Given the requirements of Rule 11 meant to insure that a defendant knows precisely what he is pleading to, there is obvious reason to be wary of such a remedy in the guilty plea setting. I therefore do not pursue the point further, and agree that Pettiford must be allowed to put the government to its proof on the Jones murder.

---

1. Pettiford's role seemed at most that of aider and abettor, and whether the U.S. Attorney's

Office would have seen this as an appropriate test case for the new statute is doubtful.