Gregory **BENNETT**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 95–CF–1178.

District of Columbia Court of Appeals.

Argued Nov. 12, 1997.

Decided Feb. 25, 1999.

---

Mark J. Rochon, with whom William P. Barry, Washington, DC, was on the brief, for appellant.

Ronald Machen, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black, and P. Kevin Carwile, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, FARRELL, Associate Judge, and KING, Senior Judge.*

KING, Senior Judge:

Gregory Bennett appeals the trial court's denial of his motion to withdraw his guilty plea to second degree murder while armed, in violation of D.C.Code § 22–2403 (1981), which was filed before sentencing. On appeal, Bennett claims the trial court abused its discretion in denying the motion to withdraw his guilty plea where Bennett's medical condition at the time of the plea precluded his entering the plea in a knowing and voluntary manner and where he had consistently asserted his innocence of the charges against

---

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on November 23, 1998.

him. Concluding that the trial judge did not abuse discretion in denying the motion to withdraw, we affirm.

## GUILTY PLEA PROCEEDING

Bennett entered his guilty plea on February 7, 1995, before Judge Harold L. Cushenberry, Jr. The case had been scheduled for trial the day before,[1] however, trial did not begin because of the unavailability of a defense witness. The trial court did consider pre-trial motions, during the course of which the possibility of a guilty plea was discussed.[2] However, when asked by the trial judge what he had decided with respect to the plea agreement, Bennett cried and said, "I don't know nothing about that case." He also said, "I'm not trying to plead guilty to nothing."[3] Later that day, government counsel stated that the plea offer was good until 10:00 a.m. the next morning, when it would be withdrawn.

The next morning, after the trial court determined that the trial would have to be continued due to the unavailability of the defense witness, who was hospitalized, Bennett's counsel ("plea attorney" or "plea counsel") stated that he "believe[d] [his client was] prepared to accept the plea offer." The

trial court then conducted the proceeding resulting in the acceptance of a guilty plea.

The government proffered that on September 8, 1993, at approximately 4:30 a.m., a group of three people which included the murder victim, Sean Gleason, went to an apartment building in Southeast Washington for the purpose of purchasing crack cocaine. They spoke with Tony Fairwell, the occupant of an apartment in the building, who told them he would take them to someone he knew who could provide them with what they were seeking to buy. Meanwhile, three acquaintances of Fairwell, one of whom was Bennett, decided to rob the prospective buyers after they returned with Fairwell from making their purchase.

Bennett and his two companions, Lewis Curtis and Ricky Walker, confronted the three buyers outside the apartment building. One of the three in Bennett's group was armed with a loaded and operable handgun and the government proffered that some of the evidence tended to show that Bennett had the gun, while other evidence tended to show that Walker had the gun.[4] Bennett, Curtis, and Walker permitted Fairwell to proceed into the apartment building and told the other three to hand over any money or drugs they had. After the victims denied having money or drugs, Gleason was shot in

---

1. On that date, the trial judge addressed the issue raised by a letter received from Bennett on January 30 in which Bennett said, in relevant part:
 I am not comfortable with [my attorney]. I do not feel he is working in my best interest. I feel like he is working against me and not for me. It seems like he's working for the prosecution. I would like to have him dismissed from this case so that another attorney could take his place.
 In response to questions by the trial judge, Bennett indicated that he was then satisfied with his attorney, wished to withdraw the letter, and was ready to go to trial.

2. Initially, Bennett's counsel requested a continuance "because of something that was just disclosed to me that—I think I have an obligation to Mr. Bennett to make this request." Following a short break in the proceedings, Bennett's counsel stated that the government had "re-extended" its plea offer but that "[t]o date, at this point in time, [Bennett] prefers to have a jury resolve the matter." Bennett then attempted to say something to the trial judge, who informed Bennett that he shouldn't speak without talking first with his attorney.

3. At that point, Bennett's counsel told the court that he believed his client was having trouble understanding that he could be found guilty of aiding and abetting without evidence that he himself had pulled the trigger. The trial judge noted that counsel had explained the concept of aiding and abetting and that Bennett "understands that's the theory. If he says he didn't do anything to aid and abet anybody, then, fine, [he] ought to have a trial. [He] obviously is uncomfortable with acknowledging his guilt, so he shouldn't."

4. Government counsel remarked that regardless of which individual had the gun, its evidence would show that all three were acting jointly in the attempted robbery and were aware that one of them would be wielding a handgun. Government counsel also stated that this showing was sufficient to support a plea of second degree murder while armed whether Bennett himself pulled the trigger or only acted as an aider and abettor.

the head. He fell to the ground and all the others fled the scene; Gleason died as a result of the bullet wound. Walker and Curtis subsequently were apprehended, pleaded guilty to offenses arising out of the incident, and agreed to testify against Bennett.

Following the government's proffer and the trial judge's recitation of the elements of second degree murder while armed and the government's burden of proof, the trial judge asked Bennett, "Is the government's statement correct?" Under oath, Bennett replied, "Yes, sir." The judge then asked, "Mr. Bennett, how do you wish to plead to the charge of murder in the second degree while armed? Are you guilty or not guilty?" Still under oath, Bennett answered, "I'm guilty."

Bennett's answers to the questions asked by the trial judge to determine whether Bennett understood the consequences of his plea were brief but responsive.[5] However, when the trial judge asked Bennett if he had had enough time to think about his decision to plead guilty, Bennett said, "No, sir." When pressed on the point, Bennett stated, "I haven't had enough time to really think about this, the plea bargain." Because the prosecution had indicated that the plea offer would be withdrawn if no plea was entered that day, the trial judge reminded Bennett that he had to make the decision at that time. Bennett responded, "The only thing I want to say, it's hard to say if it's—in one day to let me know if I want to go to trial or not, because I only had one day to decide this. So it's hard to tell—to say if I can go to trial or not because—." The trial judge again indicated that the government offer would be withdrawn, stating, "It's either today or it's

never." Bennett then said he admitted his guilt.[6]

## HEARING ON MOTION TO WITHDRAW GUILTY PLEA

On March 7, 1995, Bennett, through his attorney, filed a motion to withdraw the guilty plea and on June 30 and July 14, 1995, Judge Cushenberry conducted a hearing on the motion. Bennett testified that he did not shoot Gleason, that he was not present at the scene of the murder, that he was unfamiliar with the area where the murder occurred, that he did not know Lewis Curtis at all, and that he didn't know Ricky Walker but had "seen him before." In addition, he related that he had asked his plea attorney's investigator to show him pictures of the place where the murder occurred because he was unfamiliar with that specific location.[7]

Bennett also testified to a history of frequent epileptic seizures since 1987. After suffering a seizure, Bennett claimed, he would lose his memory for "about five or six hours." He stated that in the days following a seizure he feels "[r]eal groggy and kind of out of it. You can't really remember a lot and then you be like worried and confused about a lot of things."[8] He testified that his medication also affected his mental functioning. "The phenobarbital have you lose your speech, it have you like a lapse and have you forgetting a lot."

Bennett said that he had consistently told his lawyer he did not want to plead guilty. "[E]very time he came to see me I always told him I'm not taking the plea in this case." He testified that he told his lawyer the same

---

5. When asked by the trial judge whether he was under the influence of any alcohol or narcotic drugs, however, Bennett responded, "No, sir," although he was then taking dilantin and phenobarbital to treat his epilepsy. Neither the trial judge nor Bennett's plea attorney were aware at that time that Bennett was taking phenobarbital, a narcotic.

6. At that point, an observer in the courtroom interrupted the proceedings by calling out, "Greg." The trial judge commented, "Ma'am, we're in session," and the proceeding continued. Bennett's father testified at the plea withdrawal hearing that the woman who spoke out was Bennett's sister. The father testified that Ben-

nett's sister later told him that she was trying to tell Bennett not to plead guilty if he didn't do it and that she was also trying to tell the judge that her brother didn't understand what the judge was saying.

7. The plea attorney and his investigator visited Bennett in jail the evening before he pled guilty.

8. Bennett also testified that when he wakes up after having blacked out, he goes right back to bed and sleeps until the next day, when he is still "groggy . . . . I just stay in the bed the whole day. For that week I just be in the bed."

thing the evening of Monday, February 6, 1995, when counsel asked him if he wanted to plead guilty, and again the next morning. He believed he would be going to trial when he went to court on Monday, February 6, and again on Tuesday morning. He also said that he had expressed dissatisfaction with his lawyer through several letters to the court because he felt the lawyer was not working in his best interest and only wanted Bennett to plead guilty so he could get the case over with.

Bennett claimed he did "not really" remember pleading guilty. He testified that two days before pleading guilty, on February 5, 1995, he suffered a "really bad" seizure and did not get himself together until four or five days later. He stated that when his lawyer "asked [him] about the plea," he didn't know what he was saying and just "said okay" without realizing what he was agreeing to. He said that he "didn't really understand the questions" the judge asked him, even though he "said yeah, I understand the plea." He also testified that he signed the jury trial waiver form because he believed it was "for a jury." [9]

Bennett asserted that later on the day that the plea was entered, he called his attorney and told "an investigator or somebody" at his attorney's office that he wanted to withdraw his plea. He also claimed he asked his sister to contact his attorney to request that his plea be withdrawn, since Bennett was having trouble reaching his attorney. Bennett did not again speak with his attorney until March 2, 1995, when the lawyer visited him at the prison facility in Lorton, Virginia, and Bennett told the attorney he wanted to take his "plea back" because he was innocent.

Bennett's father testified that his son began having seizures when he was nine years old and that the seizures had become progressively worse as Bennett got older. The father testified that when Bennett has a seizure, he goes "into a shake," blacks out and is "dizzy," "druggy," and "not himself" for up to a week following the seizure. Bennett's father suggested that his son's intelligence had been affected by repeated injury to his head resulting from falls which occurred during seizures. The father further speculated that his son's mental problems were also a result of over-medication received in prison.

On cross-examination, Bennett's father testified that it was readily apparent to him and to others when his son had recently suffered a seizure. Following a seizure, Bennett would stand "with his head down" or "look sick." Also, "[s]ometimes you'll call him and he don't answer right away." In addition, the father related that "[s]ometimes he say yes when he should say no." The father testified that it was clear that his son had recently suffered a seizure on the day he pled guilty. [10]

Bennett's father also testified that when he saw his son following the guilty plea two or three days later, his son initially "didn't really know he had pleaded guilty." The father claimed that when he asked his son why he had pled guilty his son said that he did what his lawyer told him to do.

Dr. Khurrolah Abbei, a witness called by the government, testified that he was responsible for monitoring the phenobarbital and dilantin Bennett took to control his seizures. Because Dr. Abbei began treating Bennett when Bennett was transferred to Lorton following the guilty plea,[11] the doctor was un-

---

9. On cross-examination, Bennett was asked about his impression of what was occurring at court on Tuesday morning prior to his pleading guilty. He recalled his attorney coming to his cell area and talking with the government attorney about "a paper." He testified that his lawyer "[didn't] really say [anything]" to him but just asked him to sign the paper. The government argued that this detailed recollection of events, as well as Bennett's recollection of his lawyer's visit the night before, belied Bennett's contention that his mental functioning was impaired.

10. "When Greg have a seizure you can tell he's leaning—he's leaning and he can't stand up straight and he act like he tired. And Gregory really acted like he was tired like he was ready to fall out again that day when you were asking him those questions."

11. Dr. Abbei initially testified that he had been treating Bennett "for several months," then said Bennett had been under his observation for a "long period of time, ... over a year or so." He conceded on cross-examination, however, that he had only begun to treat Bennett after Bennett

able to testify from personal knowledge whether Bennett had a seizure on February 5, 1995, two days prior to the guilty plea. In addition, Dr. Abbei related that he had never observed Bennett either during or following a seizure and conceded that he therefore could not testify from personal experience to the effect Bennett's seizures had on him. Dr. Abbei did state, however, that Bennett suffered from grand mal seizures, which are "the worst kind of seizure" and can last up to half an hour. Dr. Abbei also testified that it takes about half an hour to recover from the effects of a grand mal seizure.

Dr. Abbei informed the court that Bennett's medical records from the spring of 1995 indicated that Bennett had experienced seizures at Lorton during that period. In addition, Bennett's medical records from that period showed that Bennett had complained on May 18, 1995, that he didn't want to take his prescribed phenobarbital because it was making him sleepy, that he had failed to take his prescribed medication for several days after that complaint, and that he reported having a seizure on May 22, 1995. Finally, Dr. Abbei testified, based on his review of the medical records, that Bennett had normal levels of dilantin and phenobarbital in his system on February 7, 1995, the day he pled guilty. He also observed that typical side effects of phenobarbital include drowsiness, lack of alertness, and slurred speech, but that these effects should subside within a week of beginning to take the drug.[12]

Another government witness, the plea attorney,[13] testified that he had discussed the guilty plea with Bennett on the evening of Monday, February 6, prior to the court proceeding, when the plea attorney met with Bennett at the District of Columbia Jail for more than an hour, and again the next morning, before Bennett pled guilty.[14] When asked whether it "seemed" that Bennett understood the substance of those conversations and was able to communicate with him concerning the plea, the attorney responded, "Most definitely." Plea counsel also testified that there was nothing unusual or different about his conversations with Bennett just prior to the plea as compared with previous conversations.

On cross examination, plea counsel agreed that Bennett was "not the most sophisticated client in the world." However, counsel indicated that in general Bennett did not have difficulties communicating or comprehending; rather, it was counsel's belief that "he was stubborn."

Plea counsel also testified that he was aware that Bennett was subject to seizures and that Bennett was taking dilantin; however, he was unaware that Bennett was also taking phenobarbital or any narcotic drug. Moreover, plea counsel testified that he had not believed the dilantin would affect Bennett's ability to understand the plea proceeding, since his concern prior to that time had been with the failure of prison staff to provide Bennett with his medication. Further, plea counsel testified that he believed Bennett's medication and, apparently, seizure problems had been resolved in the fall of 1994.[15]

was transferred to Lorton, which occurred after Bennett's guilty plea on February 7, 1995.

12. Dr. Abbei testified that a physician at the District of Columbia Jail prescribed dilantin and phenobarbital for Bennett as early as October 1994. The records did not reflect whether or not that date was the first time Bennett had been prescribed those drugs.

13. The plea attorney withdrew effective March 21, 1995, after filing Bennett's motion to withdraw his guilty plea, at which time Bennett's attorney in this appeal began representing him.

14. The plea attorney testified on cross examination that he had communicated the government's plea offer to Bennett in October or November 1994, when it was proposed, but that he and Bennett "never really discussed a plea at all," because "the first indication I got from him that he wanted to consider the plea was [on February 6]."

On that day counsel "came into a great deal of new information about the case," based on discussions with the government about the anticipated testimony of a government witness. Counsel called this information "a revelation." He testified that "in my mind, at least, the plea took on a whole new light" and that "[t]he government's case looked a whole lot better."

So far as the record reveals, the specific nature of the "new information" was never disclosed.

15. At that time, Bennett had a seizure in court and the plea attorney testified that he subsequently spoke with a prison doctor regarding the

Plea counsel also testified that he was aware of Bennett's family's concerns that Bennett did not understand the significance of the plea proceeding and of his family's belief that he was innocent.[16] Counsel stated that he did not raise the family's concerns about Bennett's lack of comprehension to the court because he believed Bennett did, in fact, understand the significance of the plea proceeding.[17]

Finally, plea counsel testified that the first contact he had with Bennett following the guilty plea was on March 2, 1995,—over three weeks after the plea—when he visited Bennett at Lorton regarding sentencing.[18] At that time, Bennett "announced before we even said hello to each other that he wanted to withdraw the plea ."

## THE TRIAL COURT'S RULING ON THE MOTION

At the conclusion of the hearing on July 19, 1995, Judge Cushenberry, ruling from the bench, denied the motion. The judge re-

marked that he had conducted the evidentiary hearing "in fairness to Mr. Bennett and to his family who had raised concerns about what they perceived to be his understanding and awareness of the proceedings." Other factors bearing on his decision to conduct the extensive hearing included the court's lack of awareness at the time of the plea that Bennett was taking prescribed psychotropic medication[19] and the judge's own lack of independent "recollection specifically of what happened[20] and how Mr. Bennett sounded"[21] at the plea hearing.

The trial court found that although Bennett had raised concerns about his attorney's performance prior to the guilty plea, Bennett "indicated he was completely satisfied with his lawyer and ... withdrew the letter" when the court addressed his concerns on February 6, 1995.

The trial judge credited Bennett's father's testimony that when Bennett experienced seizures, it took a day or two to recover full mental alertness.[22] However, the trial judge

fact that Bennett was not getting his medication in prison.

16. Plea counsel also testified to conversations with Bennett's family just prior to the plea hearing regarding Bennett's ability to understand the proceedings. He testified that he "wasn't surprised" when Bennett's sister tried to speak out during the proceeding. He also testified, based on his time sheets, that he had had a telephone conversation with Bennett's sister on February 9, 1995, two days after Bennett pled guilty, regarding her concerns.

17. In that regard, plea counsel testified that Bennett:

took on a different demeanor when it was just he and I .... [H]e was quite animated back in the cell block in the jail.... There was enough ... rational give and take between he and I, and he was in a difficult position. It's not a very pleasant choice to have to put somebody in a position to have to make. But he was rational, bitter about his position, stubborn, but there was never any question in my mind that he knew what he was doing and that he was the one making the decision.

18. Plea counsel also testified that he didn't believe he had received any messages from Bennett between the plea hearing and March 2, when he visited Bennett at Lorton. Upon questioning from the court, the attorney testified that he had not reviewed his receptionist's records to see whether there were any calls from Bennett dur-

ing that time; however, he testified he had no memory of Bennett calling him. He also stated that it was "very difficult" for inmates to make phone calls.

19. The judge stated, "I will be candid, that had I known he was taking psychotropic medication at the time of the plea, I probably would have had further inquiry of him with respect to what impact that may have had on him at the time that I took the plea." The judge was aware at the time of the hearing, however, that Bennett had experienced grand mal seizures.

20. Judge Cushenberry did recall that "at some point [Bennett's] sister ... wanted to interject herself and I cut her off."

21. For this reason, the trial judge listened to the tape of the plea hearing before issuing his ruling. He stated, at the hearing on the motion to withdraw, that his primary concern in reviewing the tape of the plea hearing was whether Bennett's testimony contained any slurring, stumbling, or sense of confusion that would indicate mental impairment. As reflected *infra* at 165, Judge Cushenberry was satisfied that everything was normal on that score.

22. In fact, the father testified that after a "hard" seizure it sometimes took "three or four days or sometimes a week" for Bennett to come out of it. The father was not asked about the duration of the effect of less severe seizures. This possible

did not credit Bennett's testimony or that of his father that Bennett had suffered a seizure the Sunday before the plea because of the absence of any record of that seizure in Bennett's records.[23]

The trial court credited plea counsel's testimony that "he had no trouble communicating with [Bennett]" on the night before the plea and on the morning of the plea, that counsel "had fairly detailed discussions with Mr. Bennett about his case on the night before the plea," and that Bennett "appeared to respond appropriately to [counsel's] questions" on the night before the plea.

With respect to Bennett's demeanor and conduct at the plea hearing, the judge stated that he:

> does not attribute [Bennett's] reluctance to plead guilty ... to any adverse reaction to the medication he was taking or to any decreased mental alertness attributable to a recent seizure. Rather, the court attributes [the] crying he did on February 6th as well as his initial comments to the court that he wanted to have more time to consider the plea offer ... to the normal anxiety experienced by any person who had long committed himself and members of his loving, supportive family to a different trial strategy and [who] was faced with an extraordinarily different decision to waive his right to jury trial and acknowledge his personal criminal responsibility.

The trial court did not credit Bennett's testimony at the withdrawal hearing that he did not understand the plea proceedings:

> His assertions to the contrary at this time are flatly refuted by the solemn statements he made under oath during the plea proceedings. He of course did acknowledge appropriately, although he didn't speak a lot, he spoke in soft terms, fundamental information about himself, his age, his education, his full understanding of the penalties of the offense [he would] be subjected to, including the mandatory minimum. He expressed satisfaction with his attorney at the time, and acknowledged his guilt, saying I admit my guilt when I pressed him with respect to his liability under an aiding and abetting theory.
>
> ... [H]aving listened [to the tape] ... although Mr. Bennett did speak in soft tones, there's nothing that I heard in his voice that suggests to me that when he responded to the Court's questioning he did not understand the choice he was making .... He spoke softly, he did not slur his speech, did not sound drowsy or disoriented in any way. He did seem resigned to mak[ing] a very difficult decision....
>
> To my mind, the discussions he had with me indeed demonstrate that he had an awareness of the significance of the decision he was making, at least in this respect. He had twice before talked about needing more time or wanting more time. More time ... to think about the decision whether to go to trial or plead guilty. That suggests to me not someone who [was] completely unaware of the choices he [was] making but [rather someone who] was aware of the difficulty of the choices he [was] making and [who] want[ed] to make [a choice].[24]

<hr>

discrepancy is not significant, however, because the trial court did not accept the claim that Bennett had suffered a seizure two days before the plea was entered. See note 23, *infra*.

**23.** The trial judge noted that "there are numerous other entries in defendant's chart where defendant promptly reported such incidents to appropriate medical personnel." Bennett points out, for the first time in the brief filed in this appeal, that there was no entry in Bennett's medical chart regarding a seizure he suffered in the courtroom of Judge Alprin, which is noted in the jacket entry in Bennett's court file for September 22, 1994. Therefore, Bennett argues, the absence of an entry of a seizure occurring on February 5, 1995, does not refute the testimony

of Bennett and his father where Bennett does not claim he reported that seizure to medical personnel in prison. On this record, however, we cannot say the trial court's finding that Bennett did not suffer a seizure two days before entry of the guilty plea was unsupported.

**24.** The trial judge also stated, "I struggled with the issue myself personally in this case of whether or not I did anything that might have influenced Mr. Bennett to waive his right to a trial." The trial judge noted that "the only reason" he told Bennett the plea offer was about to be withdrawn was because the government attorney had stated that the offer would be withdrawn if it were not accepted by 10:00 a.m., on Tuesday, February 7.

The trial court addressed the importance of the plea process, emphasizing the weight to be given a defendant's admissions under oath. "Whenever a person pleads guilty and a judge goes through a lengthy inquiry and they're put under oath and they admit their criminal responsibility, those solemn promises made in open court are significant and they're not likely to be withdrawn."

As the trial judge acknowledged, he was required to apply the "fair and just" standard enunciated in *Gooding v. United States*, 529 A.2d 301 (D.C.1987). In applying that standard, the following findings were made. First, the trial judge found that Bennett had "clearly" asserted his legal innocence but that he had "offered no more than a general denial to the offenses." Concerning the promptness of the motion to withdraw, the trial judge found that it was "unclear" when Bennett first attempted to contact his attorney by telephone in order to withdraw the plea but that he had no direct communication with his attorney until March 2, 1995. He found that a withdrawal of the guilty plea would not prejudice the government. The trial judge finally noted, "I have searched my mind to determine whether or not there's any fair and just reason attributable to [Bennett's] use of psychotropic medication" warranting dismissal of his guilty plea and concluded that there was none.

## LEGAL DISCUSSION

Bennett contends that the trial judge abused his discretion in denying his motion to withdraw his guilty plea in light of Bennett's consistent assertion of innocence of the charges against him and in light of his medical condition, which precluded his pleading guilty in a knowing and voluntary manner. Bennett asserts that a number of other factors also bear on the issue, including: his unwillingness to plead guilty and ultimate acquiescence in the face of coercion by his counsel and the trial court; the failure of the trial court and of plea counsel to probe the effects of Bennett's epileptic seizures and medication on his ability to plead guilty knowingly and voluntarily; Bennett's diminished mental acuity as a result of repeated epileptic seizures; and Bennett's alleged attempt to contact counsel almost immediately following the plea to tell counsel to withdraw the plea. Taken together, Bennett contends, these factors warrant a reversal of the trial court's denial of the motion to withdraw the guilty plea.

■ Under Rule 32(e), a defendant may successfully move to withdraw a guilty plea by establishing either of two separate and independent grounds. He may show that there was a fatal defect in the proceeding at which the guilty plea was taken, *see* Super. Ct.Crim. R. 11, or that justice demands withdrawal under the circumstances of the individual case, i.e., it would be "fair and just" to allow withdrawal of the plea. *Springs v. United States*, 614 A.2d 1, 3 (D.C.1992) (citation omitted). In this case, Bennett concedes that there was no Rule 11 violation; therefore we only consider whether the trial court abused its discretion in not allowing withdrawal of the plea on "fair and just" grounds. *Gooding, supra*, 529 A.2d at 306 (quoting *Kercheval v. United States*, 274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009 (1927)).

■ Initially, we note that "withdrawal of a plea is not a matter of right, and the determination of whether the defendant has met the 'fair and just' standard for withdrawing the guilty plea is left to the trial court's sound discretion." *Binion v. United States*, 658 A.2d 187, 191 (D.C.1995) (citations omitted); *United States v. Barker*, 168 U.S.App. D.C. 312, 323, 514 F.2d 208, 219 (presentence motion to withdraw guilty plea is addressed to sound discretion of trial court and reversal on appeal is "uncommon"), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975). *See also United States v. Ramos*, 810 F.2d 308, 311 (1st Cir.1987) (federal appeals court will not set aside district court's findings concerning motion to withdraw guilty plea "unless a defendant unequivocally shows an abuse of discretion"); *United States v. McKoy*, 207 U.S.App.D.C. 112, 113, 645 F.2d 1037, 1039 (1981). Therefore, we will not disturb the trial court's denial of a motion to withdraw a guilty plea, under the fair and just standard, absent a clear showing that the trial court abused its discretion.

Under the fair and just standard, the factors a trial court must consider when evaluating a motion to withdraw a guilty plea include: (1) "whether the defendant has asserted his or her legal innocence;" (2) "the length of the delay between entry of the guilty plea and the desire to withdraw it;" and (3) "whether the accused has had the full benefit of competent counsel at all relevant times." *Springs, supra*, 614 A.2d at 4 (citations omitted). " '[N]one of these factors is controlling and the trial court must consider them cumulatively in the context of the individual case.' " *Id.* (citation omitted). Moreover, the " 'circumstances of the individual case may reveal other factors which will affect the calculation ... under the fair and just standard.' " *Id.* (citation omitted). "[W]hen analyzing the [first] factor, the plea judge should consider the strength of the government's proffer and, if there has been a valid assertion of innocence, the reason the claimed defense was not put forward at the time of the plea." *Id.* (citation omitted). "[W]hen analyzing the [second] factor, the court should consider whether the government would be prejudiced by a withdrawal of the plea measured as of the time the defendant sought to withdraw it." *Id.* (citation omitted).

### Assertion of Legal Innocence

Bennett argues that the trial court's finding that his assertion was "general" in nature is belied by his testimony at the plea hearing that he was not present at the scene of the murder, did not participate in the murder, and did not even know one of the alleged co-participants in the murder. Bennett also emphasizes the fact that "he continually maintained his legal innocence," both before and after the plea hearing, "as evidenced by his repeated assertions that he was not on the scene of the shooting death with which he had been charged." Bennett maintains that his testimony at the plea withdrawal hearing provides a cognizable legal defense under the fair and just standard, particularly in light of a government case against Bennett which he claims was not overwhelming.[25]

As we emphasized in *Springs*, "[A] claim of innocence is an important, but not dispositive, factor to be weighed by the trial judge in deciding whether, in the exercise of discretion, a motion to withdraw a guilty plea, under the fair and just standard should be granted." *Id.* at 5. Therefore, we must consider whether the trial court abused its considerable discretion in denying Bennett's motion to withdraw his guilty plea in light of Bennett's claim that he was not present at the scene, together with the absence of any explanation for not asserting this defense at the plea hearing. *Id.* at 4.

In *Springs* we concluded, "It is not enough ... simply to claim one is innocent or that one did not commit the offense. 'A bald assertion of innocence ... without any grounds in support thereof will not give a defendant the absolute right to withdraw his guilty plea.' " *Id.* at 5 (citing *Patterson v. United States*, 479 A.2d 335, 340 (D.C.1984)). Rather, "the movant must set forth some facts, which when accepted as true, make out some legally cognizable defense to the charges, in order to effectively deny culpability." *Id.* (citations omitted).[26]

25. To support this contention, Bennett claims that the government's case against him was based solely upon the testimony of one of his alleged accomplices, Ricky Walker, whom the victims testified was the one who possessed the gun. Bennett also asserts that he was never identified by either of the surviving victims. The trial court made no findings concerning the strength, or weakness, of the government's case and we cannot discern from the record any basis for making such an assessment ourselves.

26. The necessary showing was not made in *Binion, supra*, where we affirmed a trial court order denying withdrawal of appellant's guilty plea to two counts of first degree murder while armed.

In that case, appellant's assertion of innocence was based on self-defense. However, the trial court there correctly concluded that as a matter of law appellant could not make out such a claim. That determination was grounded in the principle that a legally cognizable claim of self-defense requires an accused using deadly force to believe, at the time of the incident, that he is in imminent peril of death or serious bodily harm. Because Binion never repudiated his sworn statement, made when he entered his guilty plea, that at the time he shot the victims his life was no longer at peril, he did not make out a legally cognizable claim of innocence. 658 A.2d at 192–93.

■ We recognize that Bennett, in claiming that he did not participate in the murder and was not even present at the crime scene, has presented what can be described on its face as a legally cognizable defense. Still, it is a defense unsupported by any other evidence, including any representations as to his whereabouts or habitual behavior suggesting why he could not have been at the scene of the shooting.[27] Furthermore, "the mere assertion of a legally cognizable defense is [not] always a sufficient condition for securing withdrawal of a plea." *Barker, supra,* 168 U.S.App.D.C. at 325, 514 F.2d at 221.[28] *See also Austin v. United States,* 356 A.2d 648, 649 (D.C.1976); *McKoy, supra,* 207 U.S.App. D.C. at 114, 645 F.2d at 1039. We agree with the *Barker* court's observation that if the mere assertion of a legally cognizable defense were a sufficient condition for withdrawal, "the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim" rather than " 'a grave and solemn act ... accepted only with care and discernment.' " 168 U.S.App.D.C. at 325, 514 F.2d at 221 (quoting *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).[29]

Moreover, in this analysis we place considerable reliance upon the weighing by the trial judge of Bennett's sworn adoption of the facts proffered at the plea hearing against his later claim of innocence. In those circumstances the judge is not required to accept, at face value, the claim of innocence asserted. In that regard, we have squarely held that a trial judge need not credit an assertion of innocence that directly contradicts a sworn prior statement of culpability made by the defendant. *Austin, supra,* 356 A.2d at 649. In *Austin* we decided, under circumstances very similar to those presented here, that the trial court could properly reject the defendant's claim at the plea withdrawal hearing that he was unaware of the perpetrators' intent to commit burglary, in light of his clear admission at the time of the plea that he had knowingly assisted and advised the perpetrators in the commission of the offense. *See also Springs, supra,* 614 A.2d at 6–7 ("The government's proffer [which appellant adopted under oath] together with appellant's sworn statements made at the time of the pleas provided a factual context which overwhelms appellant's lame and unsupported claims of non-culpability.").

■ Here, as in *Austin,* the trial judge weighed the admissions under oath that were made at the time of the entry of the guilty plea against Bennett's contrary assertions at the withdrawal hearing, and found the former more believable. In short, as *Austin* unequivocally holds, in evaluating Bennett's claim of innocence under the fair and just standard, the trial court was free to discredit Bennett's later testimony that he did not participate in the murder and was not present at the crime scene, in the face of Bennett's admissions at the plea hearing that he in fact took part in the commission of the offense.

27. As the trial judge noted, Bennett "offered no more than a general denial to the offenses. [His] father's testimony makes it clear that he cannot provide his son with an alibi nor did any witnesses or Mr. Bennett testify as to where he was at the time ... the offense was committed."

28. The *Barker* court noted that "[w]hile some decisions have come close to suggesting that a mere assertion of innocence is enough to merit withdrawal, each of these cases involved the additional, and obviously important, consideration that the guilty pleas at issue had been entered under highly questionable circumstances." 168 U.S.App.D.C. at 325, 514 F.2d at 221. These circumstances included misunderstanding of the crimes charged, mental illness, ineffective assistance of counsel, and absence of counsel. *Id.* (citations omitted).

29. In *Springs,* appellant moved to withdraw his guilty plea to armed kidnapping and sodomy, claiming that he " 'did not commit the offense' and that he was innocent of the charges;" that he "had not been 'picked from the lineup,' and that he 'happened to be at the wrong place at the wrong time;' " and "that he 'factually did not commit the offense [he was] charged with.' " 614 A.2d at 5. We held that "[a]ppellant has done little more than make a 'bald assertion of innocence' with no elaboration concerning the defense or defenses he might interpose." *Id.* We concluded that "[the trial judge] did not abuse his discretion when he found that appellant's mere assertion of innocence, which was not supported by allegations of an adequate factual basis, was insufficient." *Id.* at 6.

Our holding in *Austin*, which permits the trial judge to disbelieve a claim of innocence, would appear to be at odds with language in other opinions to the effect that the trial court "should not attempt to decide the merits of the proffered defense, thus determining the guilt or innocence of the defendant." *Gearhart v. United States*, 106 U.S.App.D.C. 270, 273, 272 F.2d 499, 502 (1959).[30] We think that in these circumstances—where the proffered defense was so sketchy—there is no real conflict between the two principles, but even if there is conflict, the rule of *Austin* governs. In that regard, we note that the *Gearhart* court cited no authority for the observation quoted above and the principle stated is best characterized as *obiter dictum*. Moreover, in *Gearhart*, there was no conflict between the assertion of innocence at the plea withdrawal hearing and prior sworn testimony given by appellant.[31] Similarly in *Gooding*, where we quoted the cited passage from *Gearhart*, appellant's coercion defense was not at odds with his testimony at the plea hearing. *See infra* at 170 and note 34.[32] Therefore, although we have said that as a general proposition the trial judge should not ordinarily assess the merits of a proffered defense at a plea withdrawal hearing in cases where some affirmative defense was being asserted, in *Austin* we *held* that a trial judge was free to discredit a defendant's assertion of innocence when it directly contradicted the defendant's prior sworn statement of culpability. 356 A.2d at 649. Such a finding by the hearing judge is particularly compelling where, as in the present case, the later assertion of innocence is unsupported by any other evidence.

■ Finally, no weight should be given to Bennett's assertion the day before pleading guilty that he knew " 'nothing about [the] case.' " The decisive fact is that, when confronted with the prosecutor's factual proffer at the plea proceeding, Bennett affirmed it and offered no claim of innocence. "[A] court, in addressing a withdrawal motion, must consider not only whether the defendant has asserted his innocence, but also the reason why the defenses now presented were not put forward *at the time of the original pleading*." *Barker, supra*, 168 U.S.App.D.C. at 325, 514 F.2d at 221 (citations omitted) (emphasis added).[33] In *Gooding*, for example, appellant, who asserted his innocence to a kidnapping charge based on a coercion defense, convincingly maintained that his fear of reprisals by his co-defendant prevented him from asserting this defense at the time of the original pleading.[34] In contrast,

30. This statement from *Gearhart* was later quoted, uncritically and without any additional citations of authority, in both *Gooding, supra*, 529 A.2d at 306, and *Springs, supra*, 614 A.2d at 5.

31. In *Gearhart*, appellant moved to withdraw his plea of guilty to charges of forgery and the interstate transportation of forged securities on the ground that he had suffered mental blocks since childhood and was incompetent and not mentally responsible for his actions at the time the alleged offenses were committed. He claimed that he had not asserted this defense at the time of the original plea because it was " 'personal, and much to do with my relationship between my father and myself.' " 106 U.S.App.D.C. at 271, 272 F.2d at 500. There was evidence that appellant had undergone psychiatric treatment related to this condition. Because of appellant's mental condition, the reviewing court concluded that the trial judge abused discretion in denying Gearhart's motion to withdraw his guilty plea.

32. In any event, *Gooding* was decided after *Austin* and the division in *Gooding* was bound by *Austin's* holding. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971) (no division of this court will overrule a prior decision of this court).

33. Bennett argues that he asserted his innocence throughout the proceedings. However, this was not the case. It is true that Bennett initially pled not guilty. It is also true that on Monday, February 6, 1995, when the possibility of a plea was raised in court, Bennett began to cry and said, "I don't know nothing about this case," and "I'm not trying to plead guilty to nothing." However, the next day, at the plea proceeding, Bennett stated *under oath* that he was guilty of the offense.

In weighing the significance of a defendant's failure to explain his reason for not asserting his innocence sooner, the starting point for assessing the delay is the time of the entry of the guilty plea, not some earlier date. *See Barker, supra*, 168 U.S.App.D.C. at 330, 514 F.2d at 226.

34. In addition, *Gooding's* qualified admission of culpability at the plea hearing was consistent with his assertion of innocence following the hearing. At the plea hearing, he stated that he "participated knowingly, however, I would like it to be noted unwillingly." *Gooding, supra*, 529 A.2d at 308.

Bennett has offered no reason for failing to assert his innocence at the time he entered his guilty plea or at any time soon thereafter. Therefore, in assessing his assertion of innocence under the fair and just standard, we conclude that Bennett's lack of any explanation for his failure to assert his innocence at the time of the plea also weighs against him on this prong of the test. *See McKoy, supra*, 207 U.S.App.D.C. at 114, 645 F.2d at 1039 (defendant's lack of "tenable explanation" for his failure to raise possibility of insanity defense prior to plea withdrawal hearing weighs against him in consideration of assertion of innocence factor).

■ In conclusion, we are persuaded that the trial judge was free to discredit Bennett's claim of innocence where his testimony on that issue conflicted directly with his sworn acknowledgment of culpability at the plea hearing and where Bennett offered neither evidence in support of his innocence claim nor a convincing explanation for his failure to assert that claim at that time. Therefore, we hold that there was no abuse of discretion in the trial judge's determination that the "claim of innocence" factor should not weigh in Bennett's favor.

### *Length of Delay*

The length of delay between entry of the guilty plea and the expression of a desire to withdraw it is the second factor to be considered in determining whether the trial court abused its discretion in denying a motion to withdraw a guilty plea. *Springs, supra*, 614 A.2d at 7 (citation omitted). "A swift change of heart is itself a strong indication that the plea was entered in haste and confusion; [w]ithdrawal motions promptly made are re-

garded with particular favor." *Id.* (internal quotations omitted).

Bennett argues that it was error for the trial court to deny his motion in light of his "uncontradicted testimony" at the plea withdrawal hearing that Bennett attempted to reach his attorney on the same day he pled guilty, the fact that Bennett's sister spoke with his attorney two days later, and the fact that Bennett's first words to his attorney on March 2 concerned his desire to withdraw the plea.

The trial judge concluded, however, that it was "unclear at what point Bennett may have first left a telephone message with [his attorney] raising his concerns about his guilty plea" and that "[the attorney] did not communicate with the defendant on this issue until March 2, 1995." We defer to the trial judge's implicit finding that Bennett first expressed his desire to withdraw his guilty plea to his attorney just over three weeks after he pled guilty.[35]

■ In *Gooding*, we concluded that a delay of only a few days between appellant's plea and the expression of his desire to withdraw it lent considerable weight in favor of withdrawal under the fair and just standard. 529 A.2d at 310–11. *See also Binion, supra*, 658 A.2d at 191 (delay of three days between plea and expression of desire to withdraw it weighs in appellant's favor). In *Springs*, in contrast, we held that a delay of just over three weeks between the time appellant pled guilty and his initial expression of the desire to withdraw his plea weighed against him.[36] In this case, we similarly conclude that the trial judge did not err in determining that a three week delay, even in the absence of prejudice to the government, did not weigh

---

**35.** We also defer to the trial judge's finding that withdrawal of the guilty plea at that time caused no "particular prejudice" to the government's ability to retry the case.

**36.** We recognize that the present case is distinguishable from *Springs* with respect to the length of delay factor. In *Springs*, appellant first sought to withdraw his guilty plea three weeks after making it and then changed his mind and moved to strike his initial motion to withdraw his plea. Finally, eight weeks after pleading guilty, appellant again moved to withdraw his guilty plea. We ruled in *Springs* that, in addition to the initial

three week delay, appellant's vacillation and ultimate delay of eight weeks from the time of his guilty plea, weighed heavily against him. 614 A.2d at 8.

However, we conclude here that a three week delay does not constitute a "swift change of heart" under the fair and just standard such that this factor would weigh in favor of withdrawal of the guilty plea. *See Springs, supra*, 614 A.2d at 7–8. *Cf. McKoy, supra*, 207 U.S.App.D.C. at 113, 645 F.2d at 1038 (withdrawal motion filed five weeks after plea not a swift attempt at retraction).

in favor of granting Bennett's motion to withdraw his plea.[37]

### Competence of Counsel

Competence of counsel is the third factor the trial court must consider in evaluating withdrawal of a motion under the fair and just standard. *Springs, supra,* 614 A.2d at 4 (citation omitted). Bennett suggests that even if his plea counsel met the standard of performance and prejudice set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), his counsel's performance "undercuts the confidence" with which we could find that Bennett entered a knowing and voluntary guilty plea. In support of his argument, Bennett points to plea counsel's failure to notify the trial court that his client had just suffered a seizure and was taking phenobarbital and dilantin by prescription; and to his plea counsel's continual pressure on Bennett to plead guilty, where this was against Bennett's wishes and where Bennett was particularly vulnerable due to his medical condition.

 Although the trial judge made no explicit findings concerning competence of counsel,[38] the trial judge implicitly found that this factor did not provide a basis for granting Bennett's motion to withdraw his guilty plea. This finding is supported by the record. At the hearing, plea counsel testified at length on the subject of his representation of Bennett. For example, counsel testified to meeting with Bennett for more than an hour on Monday, February 6, the day before Bennett pled guilty. Counsel testified that Bennett first expressed interest in pleading guilty on that day, after counsel became aware of new information concerning the government's case.[39] Moreover, plea counsel's testimony that he believed Bennett understood the substance of his conversations with his attorney was essentially credited by the trial judge and was consistent with the judge's own assessment of that circumstance. On appeal, we defer to the trial court's assessments of witnesses' credibility and we will not disturb the trial court's factual findings unless they lack support in the record. *See, e.g., Johnson v. United States,* 616 A.2d 1216, 1234 (D.C.1992), *cert. denied,* 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993). On this record, we cannot say the trial judge erred in crediting plea counsel's testimony concerning his representation of Bennett and Bennett's mental capacity prior to pleading guilty. Nor is there any basis for disturbing the trial court's finding that counsel's representation of Bennett did not weigh in Bennett's favor under the fair and just standard

### Other Factors

 In addition to the factors we routinely consider under the fair and just analysis, we have noted the "circumstances of the individual case may reveal other factors which will affect the calculation ... under the fair and just standard." *Springs, supra,* 614 A.2d at 4 (citation omitted). Bennett suggests that his alleged mental incapacity as a result of a recent seizure and the effect of a prescribed narcotic drug in his system,

37. *But see Pettiford v. United States,* 700 A.2d 207, 217 (D.C.1997) (delay of two months does not present persuasive reason to deny motion to withdraw where counsel's incompetent performance weighs heavily in favor of granting the motion).

38. As discussed, *supra* note 1, the trial court did address, the day before the plea was entered, Bennett's dissatisfaction with his plea attorney, as expressed in a letter to the court. At that time, the judge determined a hearing on the issue was unnecessary after Bennett agreed that he wished to withdraw the letter and that he was satisfied with his attorney.

39. With respect to Bennett's contention that he was pressured both by plea counsel and by the trial judge to plead guilty, we are not persuaded that any "pressure" exerted by either was undue or weighs in Bennett's favor under the fair and just analysis. First, we cannot say from this record that plea counsel acted inappropriately in encouraging his client to plead guilty on February 6, 1995, in the face of new information that counsel characterized as highly damaging to his client's case. Second, plea counsel testified that the government made its plea offer in October or November 1994. See note 14, *supra.* Given that the plea offer had been outstanding for more than two months on February 7, and given that the government had indicated that the offer would be withdrawn if not accepted then, we see no basis for faulting the trial judge for emphasizing to Bennett that the offer would be withdrawn that day.

as well as his limited mental ability,[40] constitute such factors and weigh heavily in Bennett's favor under the fair and just standard. We disagree.[41]

Judge Cushenberry conducted a lengthy and thorough plea withdrawal hearing and then listened to the tape of the February 7 plea hearing in order to determine whether, because of his medical condition, Bennett could plead guilty knowingly and voluntarily. In concluding that his mental state posed no such impediment, the trial judge found that Bennett had not suffered a seizure two days before the February 7 plea hearing.[42] In addition, based upon what he heard when he listened to the tape of the plea hearing, the trial judge concluded that there was no impairment in Bennett's speech or mental functioning at the plea hearing.[43] Ultimately, the trial judge concluded that Bennett "had an awareness of the significance of the decision he was making," [44] and therefore, that there was no fair and just reason for permitting withdrawal of Bennett's guilty plea. Upon our review of the record, we are satisfied that the trial court did not err in so deciding.

## CONCLUSION

■ We emphasize that our standard of review is whether the trial judge abused discretion in denying the motion to withdraw the guilty plea after conducting an extensive hearing on the issues raised in Bennett's motion. After carefully weighing the evidence, applying the proper legal standard and giving thoughtful consideration to the issues raised by Bennett, the experienced and able trial judge, correctly finding that none of the *Gooding* factors weighed in Bennett's favor, determined that the interest of fairness and justice was not served by allowing Bennett to withdraw his guilty plea. As we have said, the determination of whether a defendant has met the "fair and just" standard for withdrawing a guilty plea is left to the trial court's sound discretion. *Binion, supra,* 658 A.2d at 191. We will not disturb a trial court's assessment in those circumstances absent clear abuse of that discretion. *Id.* Therefore, taking into account Bennett's weak and unsupported assertion of innocence, which conflicted with his earlier sworn admission of guilt, the less than prompt expression of his desire to withdraw his plea, and the fact that Bennett was represented by competent counsel during the period leading up to and during the entry of the guilty plea, we hold the trial court did not abuse its discretion in denying Bennett's motion.

Accordingly, the order of the trial court is hereby

*Affirmed.*

40. As evidence of limited mental ability, Bennett points to the fact that, at the time of the plea, he was a thirty-two year old man who lived with his parents and was unable to hold down a steady job because of the long-term effects of his illness on his mental health. Bennett's counsel also points to Bennett's "obvious lack of sophistication related to the criminal justice system" and his difficulty grasping the concept of aiding and abetting and its impact on the legal determination of his culpability.

41. The government has observed that Bennett's contention that his plea was involuntary is in some tension with his stipulation that there was no Rule 11 violation. We agree. The Rule 11 inquiry is designed to insure "that a defendant who waives constitutional rights ... [does] so voluntarily, knowingly, and intelligently." *Eldridge v. United States,* 618 A.2d 690, 695 (D.C. 1992) (citations omitted). By admitting that there was no Rule 11 violation, Bennett concedes that this requirement was met here.

42. See note 23, *supra.* The trial judge does not indicate in his findings the extent to which he relied on Dr. Abbei's testimony in deciding to deny Bennett's motion to withdraw his guilty plea. However, even if the trial judge had concluded that Bennett did, in fact, suffer an epileptic seizure on February 5, 1995, the record supports a further finding that Bennett would have recovered from that seizure by the time of the plea hearing two days later. Specifically, Dr. Abbei testified that, in his experience, grand mal seizures last up to half an hour and the effects of such seizures subside after another half hour.

43. This finding was bolstered by Dr. Abbei's testimony that any initial side effects of the phenobarbital Bennett was taking for his seizures would have subsided within a week after he began taking the drug, an event that occurred months before. See note 12, *supra.*

44. This finding was supported by plea counsel's testimony that Bennett understood the substance of the conversations he and Bennett had, both on the evening of February 6, 1995, and on the morning of February 7 just prior to Bennett's entering of the guilty plea, concerning the plea agreement.

WAGNER, Chief Judge, dissenting:

Under the more lenient "fair and just" standard applicable to a presentencing motion to withdraw guilty plea, in my opinion, the trial court erred in denying appellant's motion. Leave to withdraw a guilty plea before sentencing should be allowed freely, " 'if for any reason the granting of the privilege seems fair and just.' " *Gooding v. United States,* 529 A.2d 301, 306 (D.C.1987) (quoting *Kercheval v. United States,* 274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009 (1927)). Here, factors for allowing withdrawal weighed strongly in appellant's favor (*i.e.,* assertion of legal innocence, early request for withdrawal, and lack of prejudice to the government). *See Binion v. United States,* 658 A.2d 187, 191 (D.C.1995) (citing *Springs v. United States,* 614 A.2d 1, 3 (D.C.1992) (other citations omitted)). Appellant asserted his innocence both before and after the plea, and he advanced a cognizable defense. Specifically, he contended that he was not at the scene of the crime, and there was evidence that the victims had failed to identify him. Unknown to the trial court at the time of the plea, appellant had taken two drugs, dilantin and phenobarbital, a narcotic, which he contended, affected his ability to think. The trial court found specifically that withdrawal of the plea would not prejudice the government. On these facts, which are set forth more fully in the majority opinion, the "fair and just" standard was met, in my view.

Where the trial court erred in its analysis, in my opinion, was in deciding the merits of the defense advanced by appellant. In resolving a motion to withdraw a guilty plea filed before sentencing, the " 'court should not attempt to decide the merits of the proffered defense, thus determining the guilt or innocence of the defendant.' " *Gooding, supra,* 529 A.2d at 306 (quoting *Gearhart v. United States,* 106 U.S.App.D.C. 270, 272 F.2d 499, 502 (1959)). I must disagree with the majority that this court's decision in *Austin v. United States,* 356 A.2d 648, 649 (D.C. 1976) requires us to hold to the contrary. On this issue, we are bound to follow the decision in *Gearhart,* which holds that the court should not resolve the merits of the defense in deciding the motion. *M.A.P. v.*

*Ryan,* 285 A.2d 310, 312 (D.C.1971) (Decisions of the D.C. Circuit rendered before February 1, 1971, "constitute the case law of the District of Columbia").

The trial court also failed to evaluate the strength of the government's proffer. The weakness of the government's proffer tends toward allowing withdrawal of the guilty plea. *Gooding, supra* 529 A.2d at 306. Here, the government acknowledged in its proffer that there would be conflicting testimony about who actually shot the victim. As the majority points out, the trial court also made no explicit findings concerning the competence of counsel, a critical consideration in the analysis. *Id.* at 307. Given these omissions in the evaluation of appellant's request, the error in the treatment of appellant's assertion of a defense, the absence of prejudice to the government, and the other factors favoring withdrawal, I can only conclude that the trial court abused its discretion in denying appellant's motion to withdraw guilty plea. Therefore, I respectfully dissent from the opinion of the court.